# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 8, 2004      Decided February 15, 2005
Reissued February 3, 2006
Reissued June 29, 2007

No. 04-3138

IN RE: GRAND JURY SUBPOENA, JUDITH MILLER

Consolidated with
04-3139, 04-3140

Appeals from the United States District Court
for the District of Columbia
(No. 04mc00407)
(No. 04mc00460)
(No. 04mc00461)

*Floyd Abrams* argued the cause for appellants. With him on
the briefs was *Joel Kurtzberg. Donald J. Mulvihill* entered an
appearance.

*Reid Alan Cox* was on the brief for *amicus curiae* Center for
Individual Freedom in support of appellants.

*Theodore J. Boutrous, Jr.* and *Thomas H. Dupree, Jr.* were
on the brief for *amici curiae* Magazine Publishers of America,
Inc., et al. in support of appellants.

*James P. Fleissner*, Assistant U.S. Attorney, argued the

cause and filed the brief for appellee.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Opinion concurring in the judgment filed by *Circuit Judge* TATEL.

SENTELLE, *Circuit Judge*: An investigative reporter for the New York Times; the White House correspondent for the weekly news magazine Time; and Time, Inc., the publisher of Time, appeal from orders of the District Court for the District of Columbia finding all three appellants in civil contempt for refusing to give evidence in response to grand jury subpoenas served by Special Counsel Patrick J. Fitzgerald. Appellants assert that the information concealed by them, specifically the identity of confidential sources, is protected by a reporter's privilege arising from the First Amendment, or failing that, by federal common law privilege. The District Court held that neither the First Amendment nor the federal common law provides protection for journalists' confidential sources in the context of a grand jury investigation. For the reasons set forth below, we agree with the District Court that there is no First Amendment privilege protecting the evidence sought. We further conclude that if any such common law privilege exists, it is not absolute, and in this case has been overcome by the filings of the Special Counsel with the District Court. We further conclude that other assignments of error raised by appellants are without merit. We therefore affirm the decision of the District Court.

## I. Background

According to the briefs and record before us, the controversy giving rise to this litigation began with a political and news media controversy over a sixteen-word sentence in the State of the Union Address of President George W. Bush on January 28, 2003. In that address, President Bush stated: "The British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa." The ensuing public controversy focused not on the British source of the alleged information, but rather on the accuracy of the proposition that Saddam Hussein had sought uranium, a key ingredient in the development of nuclear weaponry, from Africa. Many publications on the subject followed. On July 6, 2003, the New York Times published an op-ed piece by former Ambassador Joseph Wilson, in which he claimed to have been sent to Niger in 2002 by the Central Intelligence Agency ("CIA") in response to inquiries from Vice President Cheney to investigate whether Iraq had been seeking to purchase uranium from Niger. Wilson claimed that he had conducted the requested investigation and reported on his return that there was no credible evidence that any such effort had been made.

On July 14, 2003, columnist Robert Novak published a column in the Chicago Sun-Times in which he asserted that the decision to send Wilson to Niger had been made "routinely without Director George Tenet's knowledge," and, most significant to the present litigation, that "two senior administration officials" told him that Wilson's selection was at the suggestion of Wilson's wife, Valerie Plame, whom Novak described as a CIA "operative on weapons of mass destruction." Robert Novak, *The Mission to Niger*, CHI. SUN-TIMES, July 14, 2003, *at* 31. After Novak's column was published, various media accounts reported that other reporters had been told by government officials that Wilson's wife worked at the CIA

monitoring weapons of mass destruction, and that she was involved in her husband's selection for the mission to Niger. One such article, published by Time.com on July 17, 2003, was authored in part by appellant Matthew Cooper. That article stated that:

> Some government officials have noted to Time in interviews . . . that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction . . . [and] have suggested that she was involved in the husband's being dispatched to Niger to investigate reports that Saddam Hussein's government had sought to purchase large quantities of uranium ore . . . .

Matthew Cooper et al., *A War on Wilson?*, TIME.COM, *at* http://www.time.com/time/nation/article/0,8599,465270,00.html (Dec. 13, 2004). Other media accounts reported that "two top White House officials called at least six Washington journalists and disclosed the identity and occupation of Wilson's wife." Mike Allen & Dana Priest, *Bush Administration is Focus of Inquiry; CIA Agent's Identity was Leaked to Media*, WASH. POST, Sept. 28, 2003, at A1. The Department of Justice undertook an investigation into whether government employees had violated federal law by the unauthorized disclosure of the identity of a CIA agent. *See, e.g.*, 50 U.S.C. § 421 (criminalizing, *inter alia*, disclosure of the identity of a covert agent by anyone having had authorized access to classified information). As the investigation proceeded, in December of 2003, the Attorney General recused himself from participation and delegated his full authority in the investigation to the Deputy Attorney General as Acting Attorney General. The Deputy, in turn, appointed Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, as Special Counsel and delegated full authority concerning the investigation to him. As part of the ongoing investigation, a grand jury investigation

began in January of 2004.

In cooperation with Special Counsel Fitzgerald, the grand jury conducted an extensive investigation. On May 21, 2004, a grand jury subpoena was issued to appellant Matthew Cooper, seeking testimony and documents related to two specific articles dated July 17, 2003, and July 21, 2003, to which Cooper had contributed. Cooper refused to comply with the subpoena, even after the Special Counsel offered to narrow its scope to cover only conversations between Cooper and a specific individual identified by the Special Counsel. Instead, Cooper moved to quash the subpoena on June 3, 2004. On July 6, 2004, the Chief Judge of the United States District Court for the District of Columbia denied Cooper's motion in open court, and confirmed the denial with reasoning set forth in a written order issued on July 20, 2004.

A further grand jury subpoena was issued to Time, Inc., seeking the same documents requested in the subpoena to Cooper. Time also moved to quash its subpoena. On August 6, 2004, the District Court denied Time's motion. Both Cooper and Time refused to comply with the subpoenas despite the District Court's denial of their motions to quash. The District Court thereafter found that Cooper and Time had refused to comply with the subpoenas without just cause and held them in civil contempt of court. After both Cooper and Time had filed appeals, and further negotiations between Special Counsel and the two had proceeded, Cooper agreed to provide testimony and documents relevant to a specific source who had stated that he had no objection to their release. Cooper and Time fulfilled their obligations under the agreement, the Special Counsel moved to vacate the District Court's contempt order, and the notices of appeal were voluntarily dismissed.

On September 13, 2004, the grand jury issued a further subpoena to Cooper seeking "[a]ny and all documents . . . [relating to] conversations between Matthew Cooper and official source(s) prior to July 14, 2003, concerning in any way: former Ambassador Joseph Wilson; the 2002 trip by former Ambassador Wilson to Niger; Valerie Wilson Plame, a/k/a Valerie Wilson, a/k/a Valerie Plame (the wife of former Ambassador Wilson); and/or any affiliation between Valerie Wilson Plame and the CIA."  An August 2, 2004 subpoena to Time requested "[a]ll notes, tape recordings, e-mails, or other documents of Matthew Cooper relating to the July 17, 2003 Time.com article entitled 'A War on Wilson?' and the July 21, 2003 Time Magazine article entitled, 'A Question of Trust.'"  Cooper and Time again moved to quash the subpoenas, and on October 7, 2004, the District Court denied the motion.  The two refused to comply with the subpoenas, and on October 13, 2004, the District Court held that their refusal was without just cause and held both in contempt.

In the meantime, on August 12 and August 14, grand jury subpoenas were issued to Judith Miller, seeking documents and testimony related to conversations between her and a specified government official "occurring from on or about July 6, 2003, to on or about July 13, 2003, . . . concerning Valerie Plame Wilson (whether referred to by name or by description as the wife of Ambassador Wilson) or concerning Iraqi efforts to obtain uranium."  Miller refused to comply with the subpoenas and moved to quash them.  The District Court denied Miller's motion to quash.  Thereafter, the court found that Miller had refused to comply without just cause and held her in civil contempt of court also.  She also has appealed.

The appellants have proceeded with common counsel and common briefing in a consolidated proceeding before this court.  They assert four theories for reversal.  Their first claim is that

the First Amendment affords journalists a constitutional right to conceal their confidential sources even against the subpoenas of grand juries. Secondly, they claim that reporters enjoy an evidentiary privilege under the common law to conceal confidential sources. Adjunct to this claim, while denying that the privilege is less than absolute, they argue that if the privilege is in fact qualified, the United States has not overcome the privilege. Thirdly, appellants argue that their due process rights were violated by the Special Counsel's ex parte and in camera submission of evidence to the court to establish that the United States had overcome any qualified privilege. Finally, they argue that the Special Counsel failed to comply with Department of Justice guidelines for the issuance of subpoenas to journalists, and that the failure to comply is an independent ground for reversal of their contempt conviction. Finding no grounds for relief under the First Amendment, due process clause, or Department of Justice guidelines, and persuaded that any common law privilege that exists would be overcome in this case, we affirm the judgment of the District Court for the reasons set out more fully below.

## II. Analysis

A. *The First Amendment Claim*

In his opinion below, the Chief District Judge held that "a reporter called to testify before a grand jury regarding confidential information enjoys no First Amendment protection." *In Re Special Counsel Investigation*, 332 F. Supp. 2d 26, 31 (D.D.C. 2004). Appellants argue that "this proposition of law is flatly contrary to the great weight of authority in this and other circuits." Appellants are wrong. The governing authority in this case, as the District Court correctly held, comes not from this or any other circuit, but the Supreme Court of the United States. In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the

Highest Court considered and rejected the same claim of First Amendment privilege on facts materially indistinguishable from those at bar.

Like the present case, *Branzburg* was a consolidated proceeding involving multiple contempt proceedings against news media defendants. The named petitioner, Branzburg, had been held in contempt in two related proceedings, arising from one extended task of investigative journalism. The first arose from an article published by his employer, a daily newspaper, describing his observation of two Kentucky residents synthesizing hashish from marijuana as part of a profitable illegal drug operation. The article included a photograph "of hands working above a laboratory table on . . . a substance identified . . . as hashish." 408 U.S. at 667. A Kentucky grand jury subpoenaed the journalist who "refused to identify the individuals he had seen possessing marihuana or the persons he had seen making hashish from marihuana." *Id.* at 668. Branzburg claimed privilege both under the First Amendment of the United States Constitution and various state statutory and constitutional provisions. He was held in contempt and the proceeding eventually made its way to the Supreme Court.

The second case involving petitioner Branzburg arose out of a later article published by the same newspaper describing the use of drugs in Frankfort, Kentucky. According to the article, this publication was the product of two weeks spent interviewing drug users in the area. The article further reported that its author had seen some of his sources smoking marijuana. The article related numerous conversations with and observations of unnamed drug users. Branzburg was again subpoenaed to appear before a Kentucky grand jury "to testify in the matter of violation of statutes concerning use and sale of drugs," *id*. at 669 (internal quotation marks omitted). Branzburg moved to quash the subpoena. The motion was denied. The

journalist sought the protection of the Kentucky Court of Appeals by way of mandamus and prohibition, claiming "that if he were forced to go before the grand jury or to answer questions regarding the identity of informants or disclose information given him in confidence, his effectiveness as a reporter would be greatly damaged." *Id.* at 670. The Kentucky courts rejected Branzburg's claim of a First Amendment privilege. Again, he petitioned for certiorari in the Supreme Court.

The consolidated petitions in *Branzburg* also included *In re Pappas*. Petitioner Pappas was a television newsman-photographer for a Massachusetts television station. On July 30, 1970, during a time of civil unrest in New Bedford, Massachusetts, he gained entrance to the headquarters of the Black Panther Party, upon his agreement not to disclose anything he saw or heard inside the headquarters. Subsequently, he was subpoenaed to appear before a Massachusetts grand jury. Although he appeared and answered other questions, he refused to answer any questions about what had taken place inside the Black Panther headquarters, "claiming that the First Amendment afforded him a privilege to protect confidential informants and their information." *Id.* at 673. The Massachusetts trial court denied his motion to quash made on First Amendment and other grounds and ruled that the journalist "had no constitutional privilege to refuse to divulge to the grand jury what he had seen and heard, including the identity of persons he had observed." *Id.* Like Branzburg, Pappas petitioned for certiorari to the United States Supreme Court.

In the final petition consolidated in the *Branzburg* proceedings, the Court considered the petition for certiorari of the United States from a decision of the Ninth Circuit Court of Appeals, *Caldwell v. United States*, 434 F.2d 1081 (9th Cir. 1970), in which the circuit had recognized a qualified

testimonial privilege for newsmen arising from the First Amendment and allowing a reporter claiming protection under the privilege to refuse to testify before a grand jury investigating allegations of violations of numerous criminal statutes by the Black Panther Party in California. The reporter in *Caldwell* had engaged in investigative journalism directed toward the Black Panthers at a time when they were suspected of such crimes as making threats against the President of the United States and a possible conspiracy to assassinate the President, as well as interstate travel to incite rioting and the commission of mail frauds and swindles. He claimed to have obtained information from confidential informants.

As can be seen from the account of the underlying facts in *Branzburg*, there is no material factual distinction between the petitions before the Supreme Court in *Branzburg* and the appeals before us today. Each of the reporters in *Branzburg* claimed to have received communications from sources in confidence, just as the journalists before us claimed to have done. At least one of the petitioners in *Branzburg* had witnessed the commission of crimes. On the record before us, there is at least sufficient allegation to warrant grand jury inquiry that one or both journalists received information concerning the identity of a covert operative of the United States from government employees acting in violation of the law by making the disclosure. Each petitioner in *Branzburg* and each journalist before us claimed or claims the protection of a First Amendment reporter's privilege. The Supreme Court in no uncertain terms rejected the existence of such a privilege. As we said at the outset of this discussion, the Supreme Court has already decided the First Amendment issue before us today.

In rejecting the claim of privilege, the Supreme Court made its reasoning transparent and forceful. The High Court recognized that "the grand jury's authority to subpoena

witnesses is not only historic . . . but essential to its task." 408 U.S. at 688 (citation omitted). The grand juries and the courts operate under the "longstanding principle that 'the public has a right to every man's evidence,' except for those persons protected by constitutional, common law, or statutory privilege." *Id.* (citations and internal punctuation omitted). The Court then noted that "the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination." *Id.* at 689-90. The Court then expressly declined "to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690. In language as relevant to the alleged illegal disclosure of the identity of covert agents as it was to the alleged illegal processing of hashish, the Court stated that it could not "seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about a crime than to do something about it." *Id.* at 692.

Lest there be any mistake as to the breadth of the rejection of the claimed First Amendment privilege, the High Court went on to recognize that "there remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others." *Id.* at 693. As to this category of informants, the Court was equally adamant in rejecting the claim of First Amendment privilege:

> [W]e cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future.

*Id.* at 695.

The *Branzburg* Court further supported the rejection of this claimed privilege by the commonsense observation that "it is obvious that agreements to conceal information relevant to the commission of crime have very little to recommend them from the standpoint of public policy." *Id.* at 696. While the Court recognized the right of the press to abide by its agreements not to publish information that it has, the Court stated unequivocally that "the right to withhold news is not equivalent to a First Amendment exemption from an ordinary duty of all other citizens to furnish relevant information to a grand jury performing an important public function." *Id.* at 697.

We have pressed appellants for some distinction between the facts before the Supreme Court in *Branzburg* and those before us today. They have offered none, nor have we independently found any. Unquestionably, the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists from appearing before a grand jury or from testifying before a grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any source. The Highest Court has spoken and never revisited the question. Without doubt, that is the end of the matter.

Despite the absolute and unreversed answer to the question of constitutional privilege by the Supreme Court in *Branzburg*, appellants nonetheless persist in arguing that the District Court erred in concluding that journalists subpoenaed to reveal their confidential sources before federal grand juries enjoy no First Amendment protection. They base this argument on the concurring opinion of Justice Powell in *Branzburg* and a case from this circuit, *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). These authorities, either separately or together, provide

no support for the existence of such a privilege protecting reporters subpoenaed to a grand jury. Appellants' argument concerning Justice Powell's concurrence begins with the fact that the decision of the Supreme Court was reached by a 5-4 divided Court. Thus, each of the justices joining in the result was essential to the result. Therefore, appellants argue, it is the opinion of the least encompassing justice which determines the precedent set by the decision rather than the decision which appellants style a "plurality" opinion authored by Justice White. In support of this proposition, they advance an argument that first admits that when the opinion of an individual justice is not needed for a majority his separate opinion is not a gloss giving authoritative definition to the majority opinion in which he did not join, but rather is no more than his separate thoughts, and "the meaning of a majority opinion is to be found within the opinion itself." *McKoy v. North Carolina*, 494 U.S. 433, 448 n.3 (1990) (Blackmun, J., concurring). But, appellants argue, when the individual justice is needed to constitute the majority, "the opinion is not a majority except to the extent that it agrees with his views. What he writes is not a 'gloss' but the least common denominator." That is to say, the separate opinion "cannot add to what the majority opinion holds, binding the other four justices to say what they have not said; but it can assuredly narrow what the majority opinion holds, by explaining the more limited interpretation adopted by a necessary member of that majority . . . ." *Id.* at 462 n.3 (Scalia, J., joined by Rehnquist, C.J., and O'Connor, J., dissenting).

Without attempting to resolve any dispute or difference that may exist between Justice Blackmun and the three dissenting justices in *McKoy*, even if we accept Justice Scalia's analysis at full value, it does not help appellants in this case. Justice Powell's concurring opinion was not the opinion of a justice who refused to join the majority. He joined the majority by its terms, rejecting none of Justice White's reasoning on behalf of

the majority. He wrote separately "to emphasize" what seemed to him "to be the limited nature of the Court's holding." 408 U.S. at 709 (Powell, J., concurring). Justice White's opinion is not a plurality opinion of four justices joined by a separate Justice Powell to create a majority, it is the opinion of the majority of the Court. As such it is authoritative precedent. It says what it says. It rejects the privilege asserted by appellants.

Nonetheless, appellants urge that Justice Powell must have been contemplating the creation or recognition of some further sort of First Amendment privilege for reporters asserting confidential sources, else why would he have bothered writing? To that, the United States replies that by its terms Justice Powell's opinion recognizes only that

> if the newsman is called upon to give information bearing only on a remote and tenuous relationship to the subject investigation, of if he has some other reason to believe that his testimony implicates confidential source relationships *without a legitimate need of law enforcement*, he will have access to the court on a motion to quash and an appropriate protective order may be entered.

*Id.* at 710 (emphasis added).

Therefore, the United States contends, Justice Powell, who expressed no disagreement with the majority about the existence of a constitutional privilege, only emphasized that there would be First Amendment protection in cases of bad faith investigations. Appellants counter that Justice Powell could not have meant what the United States argues, as this would have given reporters no more protection than other citizens. However, they never make it clear why they are convinced that Justice Powell must have intended to give reporters more protection than other citizens. The Constitution protects all

citizens, and there is no reason to believe that Justice Powell intended to elevate the journalistic class above the rest. *Cf. Branzburg* at 690 ("the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination.").

In any event, whatever Justice Powell specifically intended, he joined the majority. Not only did he join the majority in name, but because of his joinder with the rest of a majority, the Court reached a result that rejected First Amendment privilege not to testify before the grand jury for reporters situated precisely like those in the present case. As we noted above, there is no factual difference between *Branzburg* and the present case. If Justice Powell in any way meant to afford more protection than was afforded by the rest of the majority, that protection cannot possibly extend to appellants as *Branzburg* is directly on point and reached a result in which Justice Powell joined, rejecting the applicability of constitutional privilege.

*Zerilli* cannot possibly help appellants, although they assert that *Zerilli*, citing Justice Powell's "deciding vote" in *Branzburg*, recognized, at least in dicta, a reporter's privilege in civil cases and held that *Branzburg* was not controlling as to that issue. Indeed, the *Zerilli* Court expressly distinguished its case from *Branzburg*. "Although *Branzburg* may limit the scope of a reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective law enforcement is absent, that case is not controlling." 656 F.2d at 705. *Zerilli* has no force in the present case. Even if *Zerilli* states the law applicable to civil cases, this is not a civil case. *Zerilli* could not subtract from the Supreme Court's holding in *Branzburg*. *Zerilli*, along with several other lower court decisions cited by appellants, may recognize or at least suggest the possibility of privileges under various circumstances. None of them can change the law

applicable to grand juries as set forth in *Branzburg*. As the Supreme Court has told us:

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the court of appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484 (1989). The Supreme Court has not overruled *Branzburg*.

### B. *The Common Law Privilege*

Appellants argue that even if there is no First Amendment privilege protecting their confidential source information, we should recognize a privilege under federal common law, arguing that regardless of whether a federal common law privilege protecting reporters existed in 1972 when *Branzburg* was decided, in the intervening years much has changed. While appellants argue for an absolute privilege under the common law, they wisely recognize the possibility that a court not recognizing such an absolute privilege might nonetheless find a qualified privilege. They therefore also argue that if there is a qualified privilege, then the government has not overcome that qualified privilege. The Court is not of one mind on the existence of a common law privilege. Judge Sentelle would hold that there is no such common law privilege for reasons set forth in a separate opinion. Judge Tatel would hold that there is such a common law privilege. Judge Henderson believes that we need not, and therefore should not, reach that question. However, all believe that if there is any such privilege, it is not absolute and may be overcome by an appropriate showing. All further believe, for the reasons set forth in the separate opinion

of Judge Tatel, that if such a privilege applies here, it has been overcome. Therefore, the common law privilege, even if one exists, does not warrant reversal.

C. *The Due Process Argument*

While appellants insist that their privilege is absolute, they assert a secondary line of argument that if their privilege is conditional, then their due process rights have been violated by the refusal of the Special Counsel and the District Court to provide them access to the Special Counsel's secret evidentiary submissions in support of the enforcement of the subpoenas. This argument is without merit. As appellants themselves admit in their brief, this circuit has recognized that "a district court can ensure that [grand jury] secrecy is protected by provisions for sealed, or when necessary *ex parte*, filings." *In re Grand Jury*, 121 F.3d 729, 757 (D.C. Cir. 1997). Indeed, the rule of grand jury secrecy is so well established that we have noted that "[t]here is a plethora of authority recognizing that the grand jury context presents an unusual setting where privacy and secrecy are the norm." *In re Sealed Case*, 199 F.3d 522, 526 (D.C. Cir. 2000) (collecting authorities).

As the Supreme Court has reminded us on occasion, "the grand jury is an institution separate from the courts." *United States v. Williams*, 504 U.S. 36, 47 (1992). The function of that separate institution is to "serv[e] as a kind of buffer or referee between the government and the people." *Id.* The function of the grand jury "depends on 'maintaining the secrecy of the grand jury proceedings in the federal courts.'" *In re Sealed Case*, 199 F.3d at 526 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958)). The authorities collected in *In re Sealed Case* recite the broad variety of circumstances in which the courts have upheld this grand jury secrecy, a secrecy that has been the persistent rule for grand jury proceedings for at least

four hundred years. *See Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 218 n.9 (1979) ("Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye.").

In the *Douglas Oil* decision, the Supreme Court catalogs multiple reasons for preserving the ancient secrecy of the grand jury:

> (1) disclosure of pre-indictment proceedings would make many prospective witnesses "hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony"; (2) witnesses who did appear "would be less likely to testify fully and frankly as they would be open to retribution as well as inducements"; and (3) there "would be the risk that those about to be indicted would flee or would try to influence individual grand jurors to vote against indictment."

*In re North (Omnibus Order)*, 16 F.3d 1234, 1242 (D.C. Cir., Spec. Div., 1994) (quoting *Douglas Oil Co.*, 441 U.S. at 218-19).

Appellants have offered nothing to take the present grand jury investigation outside the general rule, let alone elevate their objections to constitutional due process status. Indeed, appellants' argument is principally built around a case from another circuit never authoritative here, no longer authoritative in the circuit of its origin, and distinguishable on its facts from the beginning. In *United States v. Dinsio*, 468 F.2d 1392 (9th Cir. 1973), the court ruled that a defendant who had been held in contempt for refusing to furnish finger and palm print exemplars to a federal grand jury was deprived of her due process rights when the district court refused to let her inspect an ex parte government affidavit upon which the court had

determined that the grand jury's request was reasonable. The Ninth Circuit itself has since declared that "to the extent that our decision in *United States v. Dinsio* . . . may be considered to support the witness in his refusal to cooperate, it has been superseded by *United States v. Mara* [410 U.S. 19 (1973)], and *United States v. Dionisio*, 410 U.S. 1 (1973)." *In re Braughton*, 520 F.2d 765, 767 (9th Cir. 1975). The Ninth Circuit went on to say "nothing in the law of this circuit now requires a court to interrupt a grand jury while a recalcitrant witness produces a series of mini trials challenging the reasonableness of the government's efforts to obtain fingerprint, voice, or handwriting exemplars or the relevance of such exemplars to the government's case." *Id.*

Similarly, *Dinsio* was never the law of this circuit, just as it is no longer the law of the Ninth Circuit, and nothing in the law of the District of Columbia Circuit requires or has ever required a district court to interrupt the grand jury while a recalcitrant witness enjoys a series of mini trials over his access to materials cloaked by grand jury secrecy.

Assuming for the sake of this case that the general rule of grand jury secrecy is not sufficient to justify the District Court's use of *in camera* and *ex parte* proceedings, we further note that we have approved the use of such a procedure in other cases raising privilege claims. In *In re Sealed Case No. 98-377*, 151 F.3d 1059 (D.C. Cir. 1998), a case, like this one, involving the use of *in camera* and *ex parte* proceedings in the context of a Rule 6(e) motion by the government, we upheld their use, and in so doing, relied, at least in part, on precedent established in privilege analysis. We observed there that "courts often use *in camera*, *ex parte* proceedings to determine the propriety of a crime fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings." *Id.* at 1075 (citing *In re Grand Jury*,

103 F.3d 1140, 1145 (3d Cir.), *cert. denied sub nom. Roe v. United States*, 520 U.S. 1253 (1997)).  Having previously noted the propriety of the procedures to protect the well-established attorney-client privilege, we are persuaded that a similar protection of grand jury secrecy is appropriate to protect whatever privilege, if any, may exist between a reporter and a confidential source.

We affirm the District Court's ruling on the maintenance of the seal of grand jury secrecy.

D.  *Department of Justice Guidelines*

In their final argument for reversal of the District Court's contempt finding, appellants contend that the Special Counsel did not comply with the Department of Justice guidelines for issuing subpoenas to news media and that such failure provides an independent basis for reversal.  The District Court expressed its doubt that the DOJ guidelines were enforceable, but found that even if they were, Special Counsel had fully complied with the guidelines.  Because we conclude that the guidelines create no enforceable right, we need not reach the question of the Special Counsel's compliance.

The guidelines in question are set forth in 28 C.F.R. § 50.10 and the United States Attorney's Manual, § 9-2.161.  Those guidelines provide that subpoenas for testimony by news media must be approved by the Attorney General, a requirement not pertinent in the present case as the Special Counsel had received delegation of all the Attorney General's authority, and should meet the following standards:

   (a)  "In criminal cases, there should be reasonable grounds to believe, based on information obtained from nonmedia sources, that a crime has occurred, and that

the information sought is essential to a successful investigation–particularly with reference to establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information." 28 C.F.R. § 50.10(f)(1).

(b) Before issuing a subpoena to a member of the news media, all reasonable efforts should be made to obtain the desired information from alternative sources. *Id.* at §§ 50.10(b), 50.10(f)(3);

(c) Wherever possible, subpoenas should be directed at information regarding a limited subject matter and a reasonably limited period of time. Subpoenas should avoid requiring production of a large volume of unpublished materials and provide reasonable notice of the demand for documents. *Id*. at § 50.10(f)(6);

(d) "The use of subpoenas to members of the news media should, except under exigent circumstances, be limited to the verification of published information and to such surrounding circumstances as relate to the accuracy of the published information." *Id.* at § 50.10(f)(4); and

(e) When issuance of a subpoena to a member of the media is contemplated, the government shall pursue negotiations with the relevant media organization. The negotiations should seek accommodation of the interests of the grand jury and the media. Where the nature of the investigation permits, the government should make clear what its needs are in a particular case as well as its willingness to respond to particular problems of the media. *Id.* at § 50.10(c).

However, as the District Court correctly observed, the guidelines expressly state that they do "not create or recognize any legally enforceable right in any person." *Id.* at § 50.10(n). This reservation has been upheld by several federal appellate and district courts. *See In re Special Proceedings*, 373 F.3d 37, 44 n.3 (1st Cir. 2004) (noting that DOJ guidelines state that they do not create legally enforceable rights); *In re Grand Jury Subpoena American Broadcasting Companies, Inc.*, 947 F. Supp. 1314, 1322 (D. Ark. 1996) (declining to quash subpoena based on failure to comply with DOJ regulations, on ground that regulations, by their own terms, confer no rights on media witnesses). *See also In re Grand Jury Proceedings No. 92-4*, 42 F.3d 876, 880 (4th Cir. 1994) (holding that special prosecutor's failure to comply with guidelines regarding issuance of subpoenas to attorney, even if applicable, were not enforceable by witness through motion to quash). The guidelines, not required by any constitutional or statutory provision, *see In re Special Proceedings*, 373 F.3d at 44 n.3, exist to guide the Department's exercise of its discretion in determining whether and when to seek the issuance of subpoenas to reporters, not to confer substantive or procedural benefits upon individual media personnel. *See In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992) (holding reporters have no right to seek enforcement of DOJ guidelines before being compelled to testify) (citing *United States v. Caceres*, 440 U.S. 741 (1979) (exclusionary rule not applicable to evidence obtained in violation of internal IRS regulations governing electronic surveillance)); *In re Grand Jury Proceedings No. 92-4*, 42 F.3d at 880 (following *In re Shain*, 978 F.2d at 854).

Appellants rely on *Morton v. Ruiz*, 415 U.S. 199 (1974). In that case, the Supreme Court stated that "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be

required." *Id.* at 235.

*Ruiz*, however, is distinguishable. Regulations considered by the Court in that case required the publication of directives that "inform the public of privileges and benefits available and of eligibility requirements." *Id.* (quotation marks omitted). The Supreme Court found that the publication requirement was intended to benefit potential beneficiaries and therefore invalidated a Bureau of Indian Affairs attempt to limit general assistance benefits to otherwise eligible beneficiaries based on an unpublished eligibility requirement. This reasoning has no applicability to the guidelines before us.

It is well established that the exercise of prosecutorial discretion is at the very core of the executive function. Courts consistently hesitate to attempt a review of the executive's exercise of that function. *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). Federal prosecutors have "broad discretion to enforce the Nation's criminal laws." *Id.* at 464 (internal punctuation and citations omitted). The prosecutor's discretion arises from their designation "as the President's delegates to help him discharge his constitutional responsibility to 'take care that the laws be faithfully executed.'" *Id.* (quoting U.S. CONST. art. II, § 3). Given the nature of the guidelines themselves, and the function they govern, we conclude that the guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors. We therefore need not reach the question of the Special Counsel's compliance with the guidelines, and again we affirm the decision of the District Court.

### III. Conclusion

For the reasons set forth above, the judgment of the District Court is affirmed.

SENTELLE, *Circuit Judge*, *concurring*: As noted in the opinion of the court, I write separately to express my differing basis for affirming the District Court on the common law privilege issue. I would hold that reporters refusing to testify before grand juries as to their "confidential sources" enjoy no common law privilege beyond the protection against harassing grand juries conducting groundless investigations that is available to all other citizens. While I understand, and do not actually disagree with, the conclusion of my colleagues that any such privilege enjoyed by the reporters has been overcome by the showing of the United States, and that we therefore need not determine whether such privilege exists, I find this ordering of issues a bit disturbing. To me, the question of the existence of such privilege *vel non* is logically anterior to the quantum of proof necessary to overcome it. While I understand Judge Henderson's theory that she cannot support a privilege afforded by the common law which would not be overcome by the quantum of proof offered by the government, I think it more logical to not reach the quantum question in the absence of a determination as to the existence of the privilege than to proceed the other way around.[1] That said, I fully join the conclusion that we should affirm the District Court's decision to hold the appellants in contempt, unswayed by their claim of protection of common law privilege. I write separately only to explain my reasons for rejecting the theory that such a privilege is known to the common law.

I base my rejection of the common law privilege theory on foundations of precedent, policy, and separation of powers. As to precedent, I find *Branzburg v. Hayes*, 408 U.S. 665 (1972), to be as dispositive of the question of common law privilege as it is of a First Amendment privilege. While *Branzburg* generally is cited for its constitutional implications, the *Branzburg* Court repeatedly discussed the privilege question in common law terms as well as constitutional. Indeed, the majority opinion by

---

[1]See Opinion of Judge Tatel at pp. 5-9.

Justice White includes the phrase "common law" no fewer than eight times. More significant than the fact that the Court frequently spoke of the common law is what the Court had to say about it: "at common law, courts consistently refuse to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." *Id.* at 685 (collecting cases).

At page 688, the Court continued, "although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, *common law*, or statutory privilege . . . is particularly applicable to grand jury proceedings." (emphasis added) (citations omitted). Significantly, the Court made this statement in the course of holding the journalists litigating before it unprotected by privilege against contempt citations. Granted, the Court expressly held that it was not about to create a new "constitutional" privilege. But in the same paragraph with that rejection it expressly discusses the possible protection of common law and in the end reaches a result that leaves the reporters unprotected. I think it therefore indisputable that the High Court rejected a common law privilege in the same breath as its rejection of such a privilege based on the First Amendment. Especially is this so when we consider that it makes little sense to assume that the Court first reached out to take a constitutional question it would not have needed to answer had there been such a common law privilege, and then proceeded to answer that question in such a fashion as to reach a result upholding contempt citations and reversing vacation of such citations.[2]

---

[2]By way of comparison, under the constitutional avoidance doctrine, the Supreme Court counsels courts "to adopt constructions

Because the Supreme Court rejected the common law privilege, I think it would be at least presumptuous if not overreaching for us to now adopt the privilege. As the opinion of the court notes, "the Supreme Court has told us:

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the court of appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

Maj. Op. at 16 (quoting *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484 (1989)).

The Supreme Court has rejected a common law privilege for reporters subpoenaed to give evidence to grand juries. In my view that rejection stands unless and until the Supreme Court itself overrules that part of *Branzburg*. Although the appellants argue that other changes in the law since *Branzburg* should lead to an opposite result, I think that argument should appropriately be made to the Supreme Court, not the lower courts.[3]

Even if appellants are correct that we would have the power

---

of statutes to 'avoid decision of constitutional questions,' not to deliberately create constitutional questions." *See, e.g., McConnell v. Federal Election Commission*, 540 U.S. 93, 180 (2003); *United States v. 37 Photographs*, 402 U.S. 363, 373 (1971), *United States ex rel. Attorney General v. Delaware and Hudson Co.*, 213 U.S. 366, 407 (1909); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring).

[3]I wish to make it plain that I do not fault the appellants for making the argument, understanding that they must if they wish to preserve it for Supreme Court review. Nonetheless, I think it is only the High Court and not this one that may act upon that argument.

to adopt such a privilege in the face of the *Branzburg* precedent, I nonetheless would not accept that invitation. Appellants' argument for our authority to adopt the new privilege begins with the Federal Rules of Evidence. Rule 501, enacted by Congress in the Federal Rules of Evidence in 1975, three years after *Branzburg*, rejected an enumeration of specific federal privileges and provided that privileges in federal criminal cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Although the rules became effective after *Branzburg*, Rule 501 does not effect any change in the authority of federal courts to adopt evidentiary privileges. Before the enactment of the Federal Rules of Evidence, the authority of the federal courts to adopt common law privileges was governed by case law. The relevant case law provided for precisely the same authority as Congress enacted in the rules. Indeed, the language of the rule is drawn directly from case law governing at the time of *Branzburg*. The Supreme Court expressly held in *Wolfle v. United States*, 291 U.S. 7 (1934), that

> the rules governing the competence of witnesses in criminal trials in the federal courts are not necessarily restricted to those local rules enforced at the time of the admission into the union of the particular state where the trial takes place, but are *governed by common law principles as interpreted and applied by the federal courts in the light of reason and experience*.

291 U.S. 7, 12 (1934) (citing *Funk v. United States*, 290 U.S. 371 (1933)) (emphasis added). Given the venerable origins of the language used in Rule 501, it cannot be said that the courts have more power to adopt privileges today than at the time of *Branzburg*. The power is precisely the same. Thus, the enactment of Rule 501 cannot by itself work any change in the law which should empower us to depart from the Supreme

Court's clear precedent in *Branzburg*.

Appellants persist, however, that the state of the common law has changed sufficiently to warrant a new approach. By appellants' count, at the time of the *Branzburg* decision, only seventeen states had enacted what appellants refer to as "shield laws" to protect journalists from forced disclosure of confidential sources or newsgathering materials, while today, thirty-one states (plus the District of Columbia) have such statutes.[4] Nonetheless, I think it remains the prerogative of the Supreme Court rather than inferior federal tribunals to determine whether these changes are sufficient to warrant an overruling of the Court's rejection of such a common law privilege in *Branzburg*.

Furthermore, even if we are authorized to make that decision, reasons of policy and separation of powers counsel against our exercising that authority. While I concede that the adoption of the "shield" by legislation rather than judicial fiat does not prevent the change being considered by the courts in assessing the common law, I find the adoption of the privilege by the legislatures of the states instructive as to how the federal government should proceed, if at all, to adopt the privilege. The statutes differ greatly as to the scope of the privilege, and as to the identity of persons entitled to the protection of the privilege.

---

[4]The fact that the adoption has been by legislation rather than court decision does not deprive the change in law of common law force. As the Supreme Court has noted, "the policy decisions of the states bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one[,]" and further has told us that "it is of no consequence that recognition of the privilege in the vast majority of the states is the product of legislative action rather than judicial decision." *Jaffee v. Redmond*, 518 U.S. 1, 12-13 (1996).

We have alluded in the majority opinion to the differing decisions of courts as to civil, criminal, and grand jury proceedings. There is also a more fundamental policy question involved in the crafting of such a privilege.

The Supreme Court itself in *Branzburg* noted the difficult and vexing nature of this question, observing that applying such privilege would make it

> necessary to define those categories of newsmen who qualify for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods.

408 U.S. at 704. The Supreme Court went on to observe that "freedom of the press is a 'fundamental personal right . . . not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets . . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" *Id.* (quoting *Lovell v. Griffin*, 304 U.S. 444, 450, 452 (1938)). Are we then to create a privilege that protects only those reporters employed by Time Magazine, the New York Times, and other media giants, or do we extend that protection as well to the owner of a desktop printer producing a weekly newsletter to inform his neighbors, lodge brothers, co-religionists, or co-conspirators? Perhaps more to the point today, does the privilege also protect the proprietor of a web log: the stereotypical "blogger" sitting in his pajamas at his personal computer posting on the World Wide Web his best product to inform whoever happens to browse his way? If not, why not? How could one draw a distinction consistent with the court's vision of a broadly granted personal right? If so, then would it not be possible for a government official wishing to

engage in the sort of unlawful leaking under investigation in the present controversy to call a trusted friend or a political ally, advise him to set up a web log (which I understand takes about three minutes) and then leak to him under a promise of confidentiality the information which the law forbids the official to disclose?

The state legislatures have dealt with this vexing question of entitlement to the privilege in a variety of ways. Some are quite restrictive. Alabama limits its protection to "person[s] engaged in, connected with, or employed on any newspaper, radio broadcasting station or television station, while engaged in a newsgathering capacity." ALA. CODE § 12-21-142. Alaska's statutes protect only the "reporter," a category limited to "person[s] regularly engaged in the business of collecting or writing news for publication or presentation to the public, through a news organization." ALASKA STAT. § 09.25.300. The statutory privilege in Arizona protects "a person engaged in newspaper, radio, television or reportorial work, or connected with or employed by a newspaper or radio or television station . . . ." ARIZ. REV. STAT. § 12-2237. Arkansas's legislature has declared the privilege applicable to "any editor, reporter, or other writer for any newspaper, periodical, or radio station, or publisher of any newspaper or periodical, or manager or owner of any radio station . . . ." ARK. CODE ANN. § 16-85-510. Delaware is perhaps the most specific, protecting a "reporter," which

> means any journalist, scholar, educator, polemicist, or other individual who either: (a) At the time he or she obtained the information that is sought was earning his or her principal livelihood by, or in each of the preceding 3 weeks or 4 of the preceding 8 weeks had spent at least 20 hours engaged in the practice of, obtaining or preparing information for dissemination with the aid of facilities for the mass

reproduction of words, sounds, or images in a form available to the general public; or (b) Obtained the information that is sought while serving in the capacity of an agent, assistant, employee, or supervisor of an individual who qualifies as a reporter under subparagraph a.

DEL. CODE ANN. tit. 10 § 4320. Presumably, states such as these would provide the privilege only to the "established" press.

Others are quite inclusive. The Nebraska legislature, for example, has declared:

(1) That the policy of the State of Nebraska is to insure the free flow of news and other information to the public, and that those who gather, write, or edit information for the public or disseminate information to the public may perform these vital functions only in a free and unfettered atmosphere; (2) That such persons shall not be inhibited, directly or indirectly, by governmental restraint or sanction imposed by governmental process, but rather that they shall be encouraged to gather, write, edit, or disseminate news or other information vigorously so that the public may be fully informed.

NEB. REV. STAT. § 20-144. To that end, it protects any "medium of communication" which term "shall include, *but not be limited to*, any newspaper, magazine, other periodical, book, pamphlet, news service, wire service, news or feature syndicate, broadcast station or network, or cable television system." *Id.* at § 20-145(2) (emphasis added).

In defining the persons protected by that privilege, Nebraska tells us that "Person shall mean any individual, partnership, limited liability company, corporation, association,

or other legal entity existing under or authorized by the law of the United States, any state or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any foreign country." *Id.* at 20-145(7). Presumably, then, Nebraska, perhaps more in keeping with the spirit of the recent revolutionaries who gave us the First Amendment, protects the pamphleteer at the rented printer, and the blogger at the PC, as well as the giant corporation with its New York publishing house.

The variety of legislative choices among the states only serves to heighten the concern expressed by the majority in *Branzburg*. *See* 408 U.S. at 704. This concern is reinforced by examination of the *Jaffee* decision, upon which appellants rely. In *Jaffee*, the Supreme Court extended a federal privilege "to confidential communications made to licensed social workers in the course of psychotherapy." 518 U.S. at 15. There is little definitional problem with the application of this privilege. The court need only ask: Does this "social worker" have a license? If the answer is "yes," then the privilege applies; if it's "no," the privilege does not. If the courts extend the privilege only to a defined group of reporters, are we in danger of creating a "licensed" or "established" press? If we do so, have we run afoul of the breadth of the freedom of the press, that "fundamental personal right" for which the Court in *Branzburg* expressed its concern? 408 U.S. at 704. Conversely, if we extend that privilege to the easily created blog, or the ill-defined pamphleteer, have we defeated legitimate investigative ends of grand juries in cases like the leak of intelligence involved in the present investigation?

Nor does the identity of the protected persons constitute the only difficult policy decision. *Branzburg* enumerates several concerns. For example, does "the public interest in possible future news about crime from undisclosed, unverified sources

. . . take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future"? *Id.* at 695. Do "agreements to conceal information relevant to the commission of crime avail little to recommend them from the standpoint of public policy"? *Id.* at 696. What are we to do with the historic common law recognition of "a duty to raise the 'hue and cry' and report felonies to the authorities"? *Id.* (*see also* authorities collected in *id.* at 696 n.34). Should we be creating immunity from prosecution for "misprision" of a felony–that is, the concealment of a felony? *Id.* at 696.

Should the privilege be absolute or limited? If limited, how limited? Without attempting to catalog, I note that the state statutes provide a variety of answers to that policy question. Therefore, if such a decision requires the resolution of so many difficult policy questions, many of them beyond the normal compass of a single case or controversy such as those with which the courts regularly deal, doesn't that decision smack of legislation more than adjudication? Here, I think the experience of the states is most instructive. The creation of a reporter's privilege, if it is to be done at all, looks more like a legislative than an adjudicative decision. I suggest that the media as a whole, or at least those elements of the media concerned about this privilege, would better address those concerns to the Article I legislative branch for presentment to the Article II executive than to the Article III courts.

For all the reasons set forth above, I would hold that there is no common law privilege protecting reporters or any other news media personnel, no matter how defined, from the reach of grand jury subpoenas on claim of confidentiality.

HENDERSON, *Circuit Judge, concurring*: I write separately to emphasize that adherence to the principle of judicial restraint—patience in judicial decision-making—would produce a better result in II.B of the majority opinion. Because my colleagues and I agree that any federal common-law reporter's privilege that may exist is not absolute and that the Special Counsel's evidence defeats whatever privilege we may fashion, we need not, and therefore should not, decide anything more today than that the Special Counsel's evidentiary proffer overcomes any hurdle, however high, a federal common-law reporter's privilege may erect.

In our circuit it is a venerable practice, and one frequently observed, to assume *arguendo* the answer to one question—*e.g.*, whether to recognize a federal common-law reporter's privilege—in order to resolve a given case by answering another and equally dispositive one—*e.g.*, whether *any* privilege would protect these reporters.[1] Although both of my colleagues

---

[1] *See, e.g., Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) (because appellant failed to show sufficient need for attorney interview notes, court "save[d] for another day" "difficult matters" of determining "degree of selection necessary to transform facts into opinions and the standard of review we should employ of a district court determination" regarding discovery of attorney work product); *Littlewolf v. Lujan*, 877 F.2d 1058, 1065 (D.C. Cir. 1989) ("find[ing] it unnecessary to address the difficult questions raised by appellants regarding the Due Process adequacy of the period provided by the Act" because "[e]ven if we assume *arguendo* that the six-month limitations period is unreasonably short and that, as a consequence, the Act effectively 'takes' the Band members' property rights, we conclude that the statute provides the Indians with just compensation"); *cf. Michel v. INS*, 206 F.3d 253, 260 n.4 (2d Cir. 2000) ("Where . . . no harm results from our failing to answer a question, we believe that the 'doctrine of judicial restraint provides a fully adequate justification for deciding [the] case on the best and narrowest ground available.'" (quoting *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 531 (1991) (Stevens, J., concurring in judgment))).

question the logic of this approach here, it is a mode of decision-making they themselves have often used.[2]  In this case, however,

[2] *See, e.g.*, *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1142 (D.C. Cir. 2002) (Sentelle, J.) (assuming union organizer's activity constituted "concerted activity" under 29 U.S.C. § 157 but holding it was not protected under statute); *Jackson v. Dist. of Columbia*, 254 F.3d 262, 265 (D.C. Cir. 2001) (Tatel, J.) ("continu[ing]" assumption that Religious Freedom Restoration Act applies to federal government and holding prisoners failed to exhaust administrative remedies); *Carney v. Am. Univ.*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998) (Tatel, J.) (assuming without deciding retaliation violates 42 U.S.C. § 1981 and remanding claim for trial); *Massachusetts. v. United States Dep't of Transp.*, 93 F.3d 890, 892 (D.C. Cir. 1996) (Sentelle, J.) ("We need not determine whether an agency's interpretation of a statute on the preemption question is subject to *Chevron* analysis in order to decide this case, as the agency's determination here cannot be upheld with or without deference.").

Judge Tatel distinguishes these cases by concluding that their analysis cannot be used to avoid the "dispositive" issue in this case. Tatel Slip Op. at 8.  There are, however, only three ways of answering the question whether these reporters' confidential source information is protected by a federal common-law privilege: (1) there is no privilege, (2) there is an absolute privilege and (3) there is a qualified privilege.  None of us, including the reporters in their brief, would choose door number two, *see* Tatel Slip Op. at 19; Appellants' Br. at 42, and only one of us heads for door number one, *see* Sentelle Slip Op. at 1.  That leaves door number three.  But in choosing this route, the critical question is not definitional, as Judge Tatel sees it, *see* Tatel Slip Op. at 8, but quantitative: Is the Special Counsel's evidentiary proffer *sufficient* to overcome *any* qualified privilege that may exist?  Because we agree that the answer is "yes," there is no need for us to go any further.  Granted, the circumstances of the cited cases differ but they use the same analysis.  Moreover, its application here is consistent with the tried and true principle that "[w]here . . . no harm results from our failing to answer a question, . . . the 'doctrine of judicial restraint provides a fully adequate justification for deciding

they employ two divergent forms of "wide-angle adjudication." *See* Harry T. Edwards, *The Role of the Judge in Modern Society: Some Reflections on Current Practices in Federal Appellate Adjudication*, 32 CLEV. ST. L. REV. 385, 414 (1983-84). Judge Sentelle would hold that a reporter enjoys no federal common-law privilege to refuse to provide a bona fide grand jury with relevant documents and testimony while Judge Tatel would fix the contours of a qualified reporter's privilege by using a novel multi-factor balancing test only to conclude that it helps these reporters not at all.[3]

While I am convinced that we need not, and therefore should not, go further than to conclude, as did the district court, *see* Appendix 35-36, 275, that the Special Counsel's showing decides the case, I feel compelled to comment briefly on my colleagues' opposing conclusions if only to make clear why I think it unwise to advance either of them. I cannot agree with Judge Sentelle's conclusion that the United States Supreme

---

[the] case on the best and narrowest ground available.'" *Michel*, 206 F.3d at 260 n.4 (quoting *Air Courier Conference of Am.*, 498 U.S. at 531 (Stevens, J., concurring in judgment)); *see supra* note 2.

[3] Judge Tatel maintains that "[f]or the sake of reporters and sources," we must establish the contours of a privilege in order to "clarify the rules governing their relationship." Tatel Slip Op. at 9. But the press's collection of information, including from confidential sources, seems to me near impervious to regulation: "[E]xperience teaches us more than sufficiently that men have nothing less in their power than their tongue . . . ." BENEDICT DE SPINOZA, ETHICS 168 (G.H.R. Parkinson ed. & trans., Oxford Univ. Press 2000); *cf.* STANLEY WALKER, CITY EDITOR 44 (Johns Hopkins Univ. Press 1999) (1934) ("Women, wampum, and wrongdoing are always news."). As the *Branzburg* Court recognized, "the relationship of many informants to the press is a symbiotic one which is unlikely to be greatly inhibited by the threat of subpoena." 408 U.S. 665, 694 (1972).

Court has answered the question we now avoid. *Branzburg v. Hayes* addressed only "whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the *First Amendment*" and "h[e]ld that *it* does not." 408 U.S. 665, 667 (1972) (emphases added). The boundaries of constitutional law and common law do not necessarily coincide, however, and while we are unquestionably bound by *Branzburg*'s rejection of a reporter's privilege rooted in the First Amendment, we are not bound by *Branzburg*'s commentary on the state of the common law in 1972. Federal Rule of Evidence 501, which came into being nearly three years after *Branzburg*, authorizes federal courts to develop testimonial privileges "in the light of reason and experience," allowing for the often evolving state of the common law. *See* FED. R. EVID. 501; *Trammel v. United States*, 445 U.S. 40, 47 (1980) ("In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege."); *id.* ("The Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolutionary development of testimonial privileges."). Judge Sentelle's view also discounts the fact that, even as they rejected a reporter's First Amendment right to withhold testimony from a bona fide grand jury, both the *Branzburg* majority opinion as well as Justice Powell's separate concurrence hint ambiguously at the existence of some special protection for reporters stemming from their significant role in sustaining our republican form of government.[4]

---

[4] *See Branzburg*, 408 U.S. at 708 ("[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment."); *id.* at 710 ("The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to

5

At the same time, I am far less eager a federal common-law pioneer than Judge Tatel as I find less comfort than he in riding *Jaffee v. Redmond*, 518 U.S. 1 (1996), into the testimonial privilege frontier. Just as Rule 501 imposes no "freeze" on the development of the common law, *see Univ. of Penn. v. EEOC*, 493 U.S. 182, 189 (1990); *Trammel*, 445 U.S. at 47, it likewise does not authorize federal courts to mint testimonial privileges for any group—including the "journalistic class," as Judge Sentelle dubs it, Maj. Slip Op. at 15—that demands one. The Supreme Court has warned that testimonial privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see Branzburg*, 408 U.S. at 690; *see also Jaffee*, 518 U.S. at 21 (Scalia, J., dissenting). Accordingly, we should proceed as cautiously as possible "when erecting barriers between us and the truth," *id.*, recognizing that the Legislature remains the more appropriate institution to reconcile the competing interests—prosecuting criminal acts versus constricting the flow of information to the public—that inform any reporter's privilege to withhold relevant information from a bona fide grand jury. *See Univ. of Penn.*, 493 U.S. at 189.

Because *Jaffee* sits rather awkwardly within a jurisprudence marked by a fairly uniform disinclination to announce new privileges[5] or even expand existing ones,[6] and even though it

---

criminal conduct.") (Powell, J., concurring); *see also In re Grand Jury*, 955 F.2d 229, 434 (4th Cir. 1992) (noting *Branzburg*'s observation that First Amendment protects reporter in grand jury proceedings initiated or conducted in bad faith presents a "paradox" because "district courts can control prosecutorial abuse in any setting, not just in cases involving the First Amendment").

[5] *See Univ. of Penn.*, 493 U.S. 182 (rejecting privilege protecting academic peer-review materials); *United States v. Gillock*, 445 U.S. 360 (1980) (rejecting privilege protecting "legislative acts"); *see also*

enjoyed the support of an overwhelming majority, I am hesitant to apply its methodology to a case that does not require us to do so. While it would not be the first of its kind, *see Lemon v. Kurtzman*, 403 U.S. 602 (1971) ("*Lemon* test"); *cf. Elk Grove Unified Sch. Dist. v. Newdow*, __ U.S. __, 124 S. Ct. 2301, 2327 n.1 (2004) ("We have selectively invoked particular tests, such as the '*Lemon* test,' with predictable outcomes." (internal citation omitted)) (Thomas, J., concurring in judgment), the type of multi-factor balancing test Judge Tatel proposes seems, at least to me, to lack analytical rigor because its application to this case is foreordained. Indeed, I am not convinced that a balancing test that requires more than an evaluation of the essentiality of the information to the prosecution and the exhaustion of available alternative sources thereof is either useful or appropriate. While Judge Tatel makes the centerpiece of his test the balancing of "the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value," *see* Tatel Slip Op. at 21, this court (in the

---

*Jaffee*, 518 U.S. at 18-36 (Scalia, J., dissenting).

[6] *See United States v. Zolin*, 491 U.S. 554 (1989) (permitting *in camera* review of materials to establish applicability of crime-fraud exception to attorney-client privilege); *Trammel v. United States*, 445 U.S. 40 (1980) (witness spouse's voluntary testimony not covered by spousal privilege); *see also Jaffee*, 518 U.S. at 18-36 (Scalia, J., dissenting).

civil context),[7] the United States Department of Justice[8] and the lone district court that has recognized a federal common-law reporter's privilege in the grand jury context[9] have declined to consider either of these factors in deciding whether to recognize

---

[7] *Zerilli v. Smith*, 656 F.2d 705, 713-714 (D.C. Cir. 1981); *Carey v. Hume*, 492 F.2d 631, 636-38 (D.C. Cir. 1972); *cf. United States v. Ahn*, 231 F.3d 26, 37 (D.C. Cir. 2000) (affirming district court's conclusion that reporter's privilege was not overcome because his testimony was not "'essential or crucial'" to defendant's case or relevant to determination of guilt or innocence).

[8] *See* 28 C.F.R. § 50.10. As Judge Tatel points out, *see* Tatel Slip Op. at 20, the Justice Department regulations aim to "strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice," *id*. § 50.10(a), but the regulations do not balance the two interests. They establish instead that, in requesting authorization to subpoena a member of the press, the government should: reasonably believe that, in a criminal case, the information sought is essential "to a successful investigation—particularly with reference to directly establishing guilt or innocence," *id.* § 50.10(f)(1); attempt unsuccessfully to obtain the information from "alternative nonmedia sources," *id.* § 50.10(f)(3); seek only to verify, "except under exigent circumstances," published information and "such surrounding circumstances as relate to the accuracy of the published information," *id.* § 50.10(f)(4); treat "[e]ven" requests for publicly disclosed information "with care to avoid claims of harassment," *id.* § 50.10(f)(5); and, "wherever possible," seek material information on a limited subject matter and for a limited time period, avoid requiring the production of large quantities of unpublished material and "give reasonable and timely notice of the demand for documents," *id.* § 50.10(f)(6).

[9] *See In re Williams*, 766 F. Supp. 358, 368-70 (W.D. Pa. 1991), *aff'd by equally divided court*, 963 F.2d 567 (3d Cir. 1992) (en banc) (order without treatment of merits).

a reporter's exemption from compulsory process.[10]  There is a good reason for this: I suspect that balancing "harm" against "news value" may prove unproductive because in most of the projected scenarios—leaks of information involving, for example, military operations, national security, policy choices or political adversaries—the two interests overlap.  Furthermore, *Branzburg* warns of the risk inherent in the judicial assessment of the importance of prosecuting particular crimes.  *See* 408 U.S. at 706 ("By requiring testimony from a reporter in investigations involving some crimes but not in others, [the courts] would be making a value judgment that a legislature had declined to make, since in each case the criminal law involved would represent a considered legislative judgment, not constitutionally suspect, of what conduct is liable to criminal prosecution. The task of judges, like other officials outside the legislative branch, is not to make the law but to uphold it in accordance with their oaths.").   And  any  evaluation  of  the  importance  of newsgathering keyed to its perceived "benefit" to the public, Tatel Slip Op. at 20; *see id.* at 27 ("beneficial newsgathering"), seems antithetical to our nation's abiding commitment to the uninhibited trade in ideas.  *See, e.g., Riley v. Nat'l Fed'n of Blind, Inc.,* 487 U.S. 781, 790-91 (1988) ("The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it."); *Cohen v. California*, 403 U.S. 15, 24 (1971) ("The

---

[10] Judge Tatel insists that his test is not "novel . . . , considering its basis in *Zerilli* and *Carey* and the Justice Department's own guidelines."  Tatel Slip Op. at 22.  But the central factors of his test—the balancing of "the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value," Tatel Slip Op. at 21—find no support that I can detect in those cases.  *See* 28 C.F.R. § 50.10; *Zerilli*, 656 F.2d at 713-714; *Carey*, 492 F.2d at 636-38.

constitutional right of free expression is . . . designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us."); *McConnell v. FEC*, 251 F. Supp.2d 176, 360 (D.D.C. 2003) ("[T]he First Amendment delegates to the populace at large the responsibility of conducting an 'uninhibited, robust, and wide-open' debate." (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964))); *cf. Gertz v. Welch, Inc.*, 418 U.S. 323, 346 (1974). Moreover, to attempt to establish the contours of a reporter's privilege here would tend, unnecessarily, to leave a future panel less maneuverability in a case that might require just that to achieve justice. On this score, Judge Tatel levels the identical charge against my approach, *see* Tatel Slip Op. at 8, but I fail to see how declining to decide whether a reporter's privilege exists or to define its contours could confine a future panel.

For the foregoing reasons, I am convinced that the court would chart the best course by charting the narrowest one and, accordingly, concur only in the judgment with respect to II.B of the majority opinion. In all other respects, I fully concur.

TATEL, *Circuit Judge*, concurring in the judgment:  This case involves a clash between two truth-seeking institutions: the grand jury and the press.  On the one hand, the grand jury, a body "deeply rooted in Anglo-American history" and guaranteed by the Fifth Amendment, *see United States v. Calandra*, 414 U.S. 338, 342-43 (1974), holds "broad powers" to collect evidence through judicially enforceable subpoenas. *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423-24 (1983).  "Without thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution." *Id.* at 424.  On the other hand, the press, shielded by the First Amendment, "has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences." *Estes v. Texas*, 381 U.S. 532, 539 (1965).  Using language we have quoted with approval, *see Carey v. Hume*, 492 F.2d 631, 634-35 (D.C. Cir. 1974), the Second Circuit aptly described this conflict between press freedom and the rule of law:  "Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society.  But basic too are courts of justice, armed with the power to discover truth.  The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press." *Garland v. Torre*, 259 F.2d 545, 548 (2d Cir. 1958).

Because I agree that the balance in this case, which involves the alleged exposure of a covert agent, favors compelling the reporters' testimony, I join the judgment of the court.  I write separately, however, because I find *Branzburg v. Hayes*, 408 U.S. 665 (1972), more ambiguous than do my colleagues and because I believe that the consensus of forty-nine states plus the District of Columbia—and even the Department of Justice—would require us to protect reporters' sources as a

matter of federal common law were the leak at issue either less harmful or more newsworthy.

## I.

Although I join the court's rejection of appellants' First Amendment argument, I am uncertain that *Branzburg* offers "no support" for a constitutional reporter privilege in the grand jury context. *See* majority op. at 12-13. To be sure, *Branzburg* upheld the enforcement of subpoenas seeking confidential source information, including notes and testimony about interviews and observations at a militant group's headquarters. *See* 408 U.S. at 672-77. Yet even the *Branzburg* majority declared that "news gathering is not without its First Amendment protections," *id.* at 707, a phrase we have interpreted (albeit in dictum) to "indicate[] that a qualified privilege would be available in some circumstances even where a reporter is called before a grand jury to testify," *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). *Branzburg*'s caveat, placed in a discussion of "[o]fficial harassment of the press" and "grand jury investigations . . . instituted or conducted other than in good faith," *Branzburg*, 408 U.S. at 707-08, seems to refer only to journalists' power to quash "unreasonable or oppressive" subpoenas, *see* Fed. R. Crim. P. 17(c)(2). But given that any witness—journalist or otherwise—may challenge such a subpoena, the majority must have meant, at the very least, that the First Amendment demands a broader notion of "harassment" for journalists than for other witnesses. Reinforcing that view, the majority added, "We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." *Branzburg*, 408 U.S. at 708. That prediction, too, would appear meaningless if no First Amendment safeguards existed for subpoenaed reporters.

Then there is Justice Powell's "enigmatic concurring opinion." *Id.* at 725 (Stewart, J., dissenting). Though providing

the majority's essential fifth vote, he wrote separately to outline a "case-by-case" approach, *see id.* at 710 (Powell, J., concurring), that fits uncomfortably, to say the least, with the *Branzburg* majority's categorical rejection of the reporters' claims. Emphasizing "the limited nature of the Court's holding," *id.* at 709, he wrote:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710. "In short," Justice Powell concluded, "the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Id.* Even more than the majority opinion, this language places limits on grand jury authority to demand information about source identities—though, again, the precise extent of those limits seems unclear.

Given *Branzburg*'s internal confusion and the "obvious First Amendment problems" involved in "[c]ompelling a reporter to disclose the identity of a confidential source," *Zerilli*, 656 F.2d at 710, it is hardly surprising that lower courts have, as Chief Judge Hogan put it, "chipped away at the holding of *Branzburg*," finding constitutional protections for reporters in "various factual scenarios different than those presented in *Branzburg*." *In re Special Counsel Investigation*, 332 F. Supp. 2d 26, 31 (D.D.C. 2004). We ourselves have affirmed the denial of a criminal defense subpoena on grounds that the defendant "failed to carry his burden" of "demonstrat[ing] that the reporters' qualified privilege should be overcome." *United States v. Ahn*, 231 F.3d 26, 37 (D.C. Cir. 2000). In civil litigation, moreover, we have held that the First Amendment

requires courts to "look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired." *Carey*, 492 F.2d at 636; *see also Zerilli*, 656 F.2d at 707 (affirming the denial of a motion to compel discovery because "in this case the First Amendment interest in protecting a news reporter's sources outweighs the interest in compelled disclosure"). Other circuits have reached similar conclusions. *See, e.g.*, *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180-81 (1st Cir. 1988) (acknowledging First Amendment limits on criminal defense subpoenas directed at news organizations); *United States v. Burke*, 700 F.2d 70, 76-77 (2d Cir. 1983) (extending a First Amendment reporter privilege developed in civil cases to a criminal defense subpoena); *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 593-99 (1st Cir. 1980) (describing First Amendment limits on discovery of reporters' sources in civil litigation); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 436-37 (10th Cir. 1977) (indicating that a qualified newsgathering privilege "is no longer in doubt"); *but see In re Grand Jury Proceedings*, 810 F.2d 580, 584-85 (6th Cir. 1987) (rejecting claims of First Amendment privilege in grand jury proceedings).

In this case, however, our hands are tied for two independent reasons. First, although this circuit has limited *Branzburg* in other contexts, *see Zerilli*, 656 F.2d at 707; *Carey*, 492 F.2d at 636; *Ahn*, 231 F.3d at 37, with respect to criminal investigations we have twice construed that decision broadly. In *Reporters Committee for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978), which addressed a First Amendment challenge regarding access to journalists' phone records and describing *Branzburg* as foreclosing "case-by-case consideration," we declared, "Good faith investigation interests *always* override a journalist's interest in protecting his source." *Id.* at 1049 (emphasis added). Echoing this broad view, we have also described *Branzburg* as "squarely reject[ing]" a claim to

"general immunity, qualified or otherwise, from grand jury questioning." *See In re Possible Violations of 18 U.S.C. 371, 641, 1503*, 564 F.2d 567, 571 (D.C. Cir. 1977). In this circuit, then, absent any indication of bad faith, I see no grounds for a First Amendment challenge to the subpoenas at issue here.

Second, although *Branzburg* involved militants and drug dealers rather than government leakers, the factual parallels between that case and this one preclude us from quashing the subpoenas on constitutional grounds. *See* majority op. at 10. If, as *Branzburg* concludes, the First Amendment permits compulsion of reporters' testimony about individuals manufacturing drugs or plotting against the government, *see* 408 U.S. at 667-69, 675-77, all information the government could have obtained from an undercover investigation of its own, the case for a constitutional privilege appears weak indeed with respect to leaks, which in all likelihood will be extremely difficult to prove without the reporter's aid. Thus, if *Branzburg* is to be limited or distinguished in the circumstances of this case, we must leave that task to the Supreme Court.

## II.

But *Branzburg* is not the end of the story. In 1975—three years after *Branzburg*—Congress enacted Rule 501 of the Federal Rules of Evidence, authorizing federal courts to develop evidentiary privileges in federal question cases according to "the principles of the common law as they may be interpreted . . . in the light of reason and experience." Fed. R. Evid. 501; *see also* Pub. L. No. 93-595, 88 Stat. 1926 (1975). Given *Branzburg*'s instruction that "Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned," 408 U.S. at 706, Rule 501's delegation of congressional authority requires that we look

anew at the "necess[ity] and desirab[ility]" of the reporter privilege—though from a common law perspective.

Under Rule 501, that common lawmaking obligation exists whether or not, absent the rule's delegation, Congress would be "the more appropriate institution to reconcile the competing interests . . . that inform any reporter's privilege to withhold relevant information from a bona fide grand jury." Sep. op. at 5 (Henderson, J., concurring) (citing *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990)); *but see* sep. op. at 4-5 (Sentelle, J., concurring) (observing that even before Rule 501, case law provided federal courts with "precisely the same authority" to recognize common law privileges) (citing *Wolfle v. United States*, 291 U.S. 7, 12 (1934)); *Univ. of Pa.*, 493 U.S. at 189 (declining to recognize a privilege "where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself"). As the Supreme Court has explained, "Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 803 n.25 (1984). Thus, subject of course to congressional override, we must assess the arguments for and against the claimed privilege, just as the Supreme Court has done in cases recognizing common law privileges since 1975. *See, e.g.*, *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996) (psychotherapist-patient); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (attorney-client); *Trammel v. United States*, 445 U.S. 40, 51 (1980) (confidential marital communications).

In this case, just as *Jaffee v. Redmond* recognized a common law psychotherapist privilege based on "the uniform judgment of the States," 518 U.S. at 14, I believe that "reason and experience" dictate a privilege for reporters' confidential sources—albeit a qualified one. Guided by *Jaffee*'s reasoning, I reach this conclusion by considering first whether "reason and experience" justify recognizing a privilege at all, and if so

whether the privilege should be qualified or absolute and whether it should cover the communications at issue in this case.

Before undertaking that analysis, I think it helpful to explain why, in my view, we should not, as would Judge Henderson, short-circuit *Jaffee*'s framework and decide whether the special counsel may overcome the reporter privilege without ever reaching the issue of whether the privilege in fact exists. *See* sep. op. at 1 (Henderson, J., concurring). Unless we conclude, as does Judge Sentelle, *see* sep. op. at 1 (Sentelle, J., concurring), and as did the district court, *see In re Special Counsel Investigation*, 338 F. Supp. 2d 16, 18-19 (D.D.C. 2004), that no privilege exists, we cannot resolve this case without adopting *some* standard. Judge Henderson criticizes my approach, but she never indicates what standard she would apply, except to state that "the Special Counsel's evidentiary proffer overcomes any hurdle, however high, a federal common-law reporter's privilege may erect." *See* sep. op. at 1 (Henderson, J., concurring). To reach even that conclusion, however, one must explain why federal common law cannot support any higher "hurdle," such as an absolute privilege for source identities, which exists in the District of Columbia and several states, *see, e.g.*, D.C. Code Ann. §§ 16-4702, 16-4703(b); 42 Pa. Cons. Stat. § 5942; Ala. Code § 12-21-142, or a privilege that applies unless non-disclosure "will cause a miscarriage of justice," N.D. Cent. Code § 31-01-06.2; *see also* Minn. Stat. § 595.024; N.M. Stat. Ann. § 38-6-7. Without ruling out all such plausible alternatives that would allow the reporters to prevail, how could one know that they cannot prevail here? And without selecting some other test based on *Jaffee* and Rule 501, how could one know that no such alternatives are plausible?

Because the *Jaffee* analysis is thus essential to resolving this case (assuming a privilege exists), our frequent practice of avoiding non-essential issues is inapplicable. To be sure,

declining to resolve waived issues, *see, e.g.*, *Carney v. Am. Univ.*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998), disposing of procedurally defective claims without reaching the merits, *see, e.g.*, *Jackson v. District of Columbia*, 254 F.3d 262, 264, 270-71 (D.C. Cir. 2001); *cf. Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 891 (D.C. Cir. 1996) (assuming deferential review because even under that standard agency action was unreasonable), and expressing no view on one element of a claim because another element is clearly defective, *see, e.g.*, *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1142 (D.C. Cir. 2002); *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997); *Littlewolf v. Lujan*, 877 F.2d 1058, 1060 (D.C. Cir. 1989), may well represent "patience in judicial decision-making," sep. op. at 1 (Henderson, J., concurring). Patience, however, cannot justify "declining . . . to define [the disputed privilege's] contours," *see id.* at 9, for that is the dispositive issue in this case.

Accordingly, given that we must apply some test to the government's showing, if we simply assume the privilege exists but our assumption is wrong, then we will have reached out to establish a framework for a non-existent claim—an undertaking hardly consistent with principles of judicial restraint. Indeed, our decision would establish a precedent, potentially binding on future panels, regarding the scope of the assumed privilege, even though resolving that question was entirely unnecessary. Therefore, I think it imperative to decide as a threshold matter whether the privilege exists, turning only afterwards to the privilege's specific contours.

In this case, moreover, the issue of the privilege's existence is fully briefed, and resolving it definitively will provide critical guidance in similar situations in the future. This is not the only case to raise reporter privilege issues in D.C. federal courts in recent years. *See Lee v. U.S. Dep't of Justice*, 327 F. Supp. 2d 26 (D.D.C. 2004); *Lee v. U.S. Dep't of Justice*, 287 F. Supp. 2d

15 (D.D.C. 2003). And given the many leaks that no doubt occur in this city every day, it would be naive to suppose that it will be the last. For the sake of reporters and sources whom such litigation may ensnare, we should take this opportunity to clarify the rules governing their relationship.

Thus, I agree with Judge Sentelle that "the question of the existence of such privilege *vel non* is logically anterior to the quantum of proof necessary to overcome it." Sep. op. at 1 (Sentelle, J., concurring). Without resolving the first question, we cannot and should not decide the second.

### *Existence of the Privilege*

Under *Jaffee*, the common law analysis starts with the interests that call for recognizing a privilege. *See* 518 U.S. at 11. If, as the Supreme Court held there, "[t]he mental health of our citizenry is a public good of transcendent importance," *id.*—one that trumps the "fundamental maxim that the public has a right to every man's evidence," *id.* at 9 (internal quotation marks and ellipsis omitted)—then surely press freedom is no less important, given journalism's vital role in our democracy. Indeed, while the *Jaffee* dissenters questioned psychotherapy's "indispensable role in the maintenance of the citizenry's mental health," *see id.* at 22 (Scalia, J., dissenting), the First Amendment's express protection for "freedom . . . of the press" forecloses any debate about that institution's "important role in the discussion of public affairs," *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Brown v. Hartlage*, 456 U.S. 45, 52 (1982) (quoting *Mills*, 384 U.S. at 218-19).

Like psychotherapists, as well as attorneys and spouses, all of whom enjoy privileges under Rule 501, *see, e.g.*, *Jaffee*, 518

U.S. at 18 (psychotherapists); *Upjohn Co.*, 449 U.S. at 389 (attorneys); *SEC v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997) (spouses), reporters "depend[] upon an atmosphere of confidence and trust," *Jaffee*, 518 U.S. at 10. If litigants and investigators could easily discover journalists' sources, the press's truth-seeking function would be severely impaired. Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds; they could report arrest statistics, but not garner first-hand information about the criminal underworld. Such valuable endeavors would be all but impossible, for just as mental patients who fear "embarrassment or disgrace," *id.*, will "surely be chilled" in seeking therapy, *id.* at 12, so will sources who fear identification avoid revealing information that could get them in trouble.

Because of these chilling effects, "[w]ithout a privilege, much of the desirable evidence to which litigants . . . seek access . . . is unlikely to come into being." *Id.* Consequently, as with other privileges, "the likely evidentiary benefit that would result from the denial of the privilege is modest." *Id.* At the same time, although suppression of some leaks is surely desirable (a point to which I shall return), the public harm that would flow from undermining all source relationships would be immense. For example, appellant Judith Miller tells us that her Pulitzer Prize-winning articles on Osama bin Laden's terrorist network relied on "information received from confidential sources at the highest levels of our government." (Miller Aff. ¶ 10, Appellant's App. at 169.) Likewise, appellant Matthew Cooper maintains that his reports for "*Time*'s four million-plus readers about White House policy in Iraq, the chances of passage of major legislation such as Budget and Energy Bills, and the Clinton White House" would have been impossible without confidentiality. (Cooper Aff. ¶ 21, Appellant's App. at 286.)

Insofar as such stories exemplify the press's role "as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were elected to serve," *Mills*, 384 U.S. at 219, "reason and experience" support protecting newsgathering methods crucial to their genesis. Acknowledging as much in *Zerilli*, we emphasized that "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability" and weaken "a vital source of information," leaving citizens "far less able to make informed political, social, and economic choices." 656 F.2d at 711.

It is true, as the special counsel observes, that apart from affidavits and citations to two articles in their reply brief, the reporters present no empirical evidence that denial of the privilege "will have a significant impact on the free flow of information protected by the First Amendment." Appellee's Br. at 47. But the Supreme Court has never required proponents of a privilege to adduce scientific studies demonstrating the privilege's benefits. Rather, as the *Jaffee* dissenters pointed out, the empirical question—"[h]ow likely is it that a person will be deterred from seeking psychological counseling, or from being completely truthful in the course of such counseling, because of fear of later disclosure in litigation?"—was one "[t]he Court [did] not attempt to answer." 518 U.S. at 22-23 (Scalia, J., dissenting). Instead, following the wise precept that common sense need not be "the mere handmaiden of social science data or expert testimonials," *Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998), *Jaffee* relied on the traditional common law process: it examined the logical prerequisites of the confidential relationship, taking into account the policy and experience of parallel jurisdictions. *See Jaffee*, 518 U.S. at 10 (reasoning that given the need for "frank and complete disclosure of facts, emotions, memories, and fears" in psychotherapy, "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment").

Likewise, in *Trammel v. United States*, while justifying the privilege against adverse spousal testimony in terms of "marital harmony," 445 U.S. at 44-45, 53, the Court allowed waiver by the testifying spouse based not on divorce statistics or psychological studies, but rather on the commonsense supposition that "[w]hen one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair," *id.* at 52. And in *Swidler & Berlin v. United States*, 524 U.S. 399 (1998), though finding the "empirical information . . . scant and inconclusive," *id.* at 410, the Court held that the attorney-client privilege survives the client's death because "[k]nowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel," *id.* at 407—a proposition the Court supported with neither evidence nor even citation. Given these decisions, the equally commonsense proposition that reporters' sources will be more candid when promised confidentiality requires no empirical support.

In any event, the special counsel's confidence that exposing sources will have no effect on newsgathering is unjustified. Citing the "'symbiotic' relationships between journalists and public officials," the special counsel presumes that leaks will go on with or without the privilege. Appellee's Br. at 47 (quoting *Branzburg*, 408 U.S. at 694); *see also* sep. op. at 3 n.3 (Henderson, J., concurring). Not only does this contradict the Justice Department's own guidelines, which expressly recognize that revealing confidential sources can "impair the news gathering function," 28 C.F.R. § 50.10, but the available evidence suggests the special counsel is wrong. As anyone with even a passing interest in news knows, reporters routinely rely on sources speaking on condition of anonymity—a strong indication that leakers demand such protection. Besides, for all the reasons that lead me to conclude that a privilege exists, reporters and their editors, attorneys, and sources probably

believe the same, making it speculative indeed for the special counsel to suppose that dashing that expectation of confidentiality would have no effect on newsgathering.

Turning next, as did *Jaffee*, to the consensus among states, I find support for the privilege at least as strong for journalists as for psychotherapists. Just as in *Jaffee*, where "the fact that all 50 states and the District of Columbia have enacted into law some form of psychotherapist privilege" favored an exercise of federal common lawmaking, *see* 518 U.S. at 12, so here undisputed evidence that forty-nine states plus the District of Columbia offer at least qualified protection to reporters' sources confirms that "'reason and experience' support recognition of the privilege," *id.* at 13. Indeed, given these state laws, "[d]enial of the federal privilege . . . would frustrate the purposes of the state legislation" by exposing confidences protected under state law to discovery in federal courts. *See id.*

Making the case for a privilege here even stronger than in *Jaffee*, federal authorities also favor recognizing a privilege for reporters' confidential sources. As noted earlier, we ourselves have limited discovery of reporters' sources in both civil and criminal litigation, *see Zerilli*, 656 F.2d at 707; *Carey*, 492 F.2d at 636; *Ahn*, 231 F.3d at 37, as have other federal courts, *see, e.g.*, *Bruno & Stillman,* 633 F.2d at 593-99; *Burke*, 700 F.2d at 76-77; *Silkwood*, 563 F.2d at 436-37, including some acting on the basis of Rule 501, *see, e.g.*, *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979) (recognizing a qualified common law privilege in civil litigation); *but see In re Grand Jury Proceedings*, 5 F.3d 397, 398 (9th Cir. 1993) (holding that no "scholar's privilege" exists under the First Amendment or common law). In addition, the Justice Department guidelines (though privately unenforceable, for reasons the court explains, *see* majority op. at 20-23) establish a federal policy of protecting "news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function."

28 C.F.R. § 50.10. Denial of the privilege, then, would not only buck the clear policy of virtually all states, but would also contradict regulations binding on the federal government's own lawyers.

Resisting this consensus, the special counsel asserts that *Branzburg* already performed the analysis required by Rule 501, thus "resolv[ing] the common law argument." Appellee's Br. at 35; *see also* sep. op. at 1-3 (Sentelle, J., concurring). *Branzburg* did no such thing. As the *Branzburg* majority's very first sentence makes plain, the "issue" in that case was "whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press *guaranteed by the First Amendment*," 408 U.S. at 667 (emphasis added), not whether it abridged the common law. Later emphasizing the same point, the majority stated, "Petitioners Branzburg and Pappas and respondent Caldwell press *First Amendment claims*." *Id.* at 679 (emphasis added); *see also* sep. op. at 3-4 (Henderson, J., concurring). Indeed, having examined the briefs and lower court opinions, I see no evidence that the parties ever even argued for a separate common law privilege. To be sure, the majority declared that "the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation," *id.* at 685, but that point served only to reinforce the majority's constitutional holding.

Nor does *Branzburg* support the concurrence's constitutional avoidance theory. *See* sep. op. at 2 (Sentelle, J., concurring). Although the *Branzburg* majority could have avoided the First Amendment claim by recognizing a common law privilege, given that the majority opinion neither did so nor even raised that possibility, *Branzburg*'s holding hardly forecloses the common law argument presented here. Quite the contrary, *Branzburg* acknowledged that "Congress has freedom to determine whether a statutory newsman's privilege is

necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned," 408 U.S. at 706, a power Congress delegated to the federal courts through Rule 501. Thus, if anything, the view that *Branzburg* disposed of the common law privilege gets it backwards. Insofar as *Branzburg* relied on the "great weight of authority" to discern the First Amendment's meaning, *see id.* at 686, the shift in favor of the privilege since that time—from seventeen states with statutory privileges then to thirty-one plus D.C. today, with another eighteen providing common law protection—could provide a basis for rethinking *Branzburg*. *Cf. Atkins v. Virginia*, 536 U.S. 304, 306-07 (2002) (overturning prior understanding of Eighth Amendment "cruel and unusual punishment" based on a "consensus" among "the American public, legislators, scholars, and judges" regarding execution of the mentally retarded). Although that is something only the Supreme Court can do, this point underscores the error in seeing *Branzburg* as dispositive.

Given that the common law issue thus remains open, this court must assess the reporters' claim in light of "reason and experience" today. As *Branzburg* itself observes in describing Congress's powers, privilege rules may require "refashion[ing] . . . as experience from time to time may dictate." 408 U.S. at 706. Bestowing that refashioning power on the federal courts, Rule 501 evidences an "affirmative intention not to freeze the law of privilege," but rather "to leave the door open to change." *Trammel*, 445 U.S. at 47. Consistent with that intent, the Court in *Trammel* modified the privilege against adverse spousal testimony recognized just twenty-two years earlier in *Hawkins v. United States*, 358 U.S. 74 (1958), allowing the testifying spouse to waive the privilege, *see Trammel*, 445 U.S. at 53, even though *Hawkins* had held just the opposite, *see Hawkins*, 358 U.S. at 77-78. Had the Supreme Court addressed a common law claim in *Branzburg*, lower courts might lack authority to reconsider that case's result notwithstanding the subsequent

growth in support for the privilege. *But cf. Trammel*, 445 U.S. at 43 (affirming court of appeals decision limiting *Hawkins*). Absent such a definitive ruling, however, and despite *Branzburg*'s observation about the "great weight of authority" thirty-three years ago, *see* 408 U.S. at 686, we must approach the issue with the same open-mindedness demonstrated by *Trammel*.

For much the same reason, the omission of a reporter privilege from the Judicial Conference Advisory Committee's draft rules submitted to Congress in 1972 (and ultimately replaced by Rule 501) need not dictate the outcome here. True, as the special counsel points out, the Supreme Court in *United States v. Gillock*, 445 U.S. 360, 367-68 (1980), declined to recognize a privilege not appearing in the Advisory Committee draft. As that decision acknowledges, however, the draft rules merely reflected what was "thought to be . . . indelibly ensconced in our common law" at the time. *See id.* Accordingly, when the *Jaffee* Court considered whether the psychotherapist privilege extended to social workers, it relied not on the 1972 draft, which covered only licensed psychotherapists, but rather on the reasons for the privilege and the state laws in effect when *Jaffee* was decided. *See Jaffee*, 518 U.S. at 15-17 & n.16. Likewise, here, the dramatic growth in support for the reporter privilege supercedes the Advisory Committee's decades-old choice to omit the privilege from its draft.

Equally inconsequential is the adoption of the reporter privilege in thirty-one states through legislation, rather than judicial action. *See* sep. op. at 5 (Sentelle, J., concurring). As the *Jaffee* dissent pointed out, a far greater proportion of states—indeed, *every* state—established the psychotherapist privilege by statute, *see Jaffee*, 518 U.S. at 25-26 (Scalia, J., dissenting), yet the majority considered that fact "of no consequence," *id.* at 13-14. Nor does it matter that

unconventional forms of journalism—freelance writers and internet "bloggers," for example—may raise definitional conundrums down the road. *See* sep. op. at 5-9 (Sentelle, J., concurring); *but see* Eugene Volokh, Opinion, *You Can Blog, But You Can't Hide*, N.Y. Times, Dec. 2, 2004, at A39 ("[T]he rules should be the same for old media and new, professional and amateur. Any journalist's privilege should extend to every journalist."). As *Jaffee* makes clear, "[a] rule," such as Rule 501, "that authorizes the recognition of new privileges on a case-by-case basis makes it appropriate to define the details of new privileges in a like manner." 518 U.S. at 18. After all, "flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." *Hurtado v. California*, 110 U.S. 516, 530 (1884). Here, whereas any meaningful reporter privilege must undoubtedly encompass appellants Cooper and Miller, full-time journalists for *Time* magazine and the *New York Times*, respectively, future opinions can elaborate more refined contours of the privilege—a task shown to be manageable by the experience of the fifty jurisdictions with statutory or common law protections.

In sum, "reason and experience," as evidenced by the laws of forty-nine states and the District of Columbia, as well as federal courts and the federal government, support recognition of a privilege for reporters' confidential sources. To disregard this modern consensus in favor of decades-old views, as the special counsel urges, would not only imperil vital newsgathering, but also shirk the common law function assigned by Rule 501 and "freeze the law of privilege" contrary to Congress's wishes, *see Trammel*, 445 U.S. at 47.

### *Scope of the Privilege*

The next step, according to *Jaffee*, is to determine what principles govern the privilege's application in this case. *See Jaffee*, 518 U.S. at 15-16 (deciding first that a psychotherapist

privilege exists and only then addressing whether the privilege applies to social workers).  Pointing out that many jurisdictions recognize only qualified protection for reporters, the special counsel argues that the uniform judgment of states must support application of the privilege in the precise context at issue—defiance of grand jury subpoenas—before federal courts may recognize it.  That view, however, belonged to the *Jaffee* dissent, not the seven-justice majority.  Although the dissenters noted an "enormous degree of disagreement among the States as to the scope of the privilege," 518 U.S. at 33 (Scalia, J., dissenting), particularly as to which professions it covered, *see id.* at 27 (Scalia, J., dissenting), the Court extended the privilege to licensed social workers because "[t]he reasons for recognizing a privilege for treatment by psychiatrists and psychologists apply with equal force to treatment by a clinical social worker," *id.* at 16-17.  Likewise, *Jaffee* rejected a proposed balancing test not because other jurisdictions had done so, but because "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *See id.* at 17-18.

Here, even assuming that some jurisdictions categorically exclude grand jury subpoenas—a proposition for which the special counsel cites no authority—the interests protected by the privilege militate against such a limited approach.  Although the public interest in law enforcement may well be at its apex when the government is investigating crime, news stories of paramount First Amendment importance, such as reports about government corruption or wrongdoing, may involve sources who "would surely be chilled," *Jaffee*, 518 U.S. at 12, if they thought grand juries could discover their identities from reporters in whom they confide.  Furthermore, the special counsel's proposal is quite anomalous, considering that neither the attorney-client, nor the spousal, nor even the psychotherapist

privilege gives way to the grand jury's truth-seeking function. *See, e.g.*, *Swidler & Berlin*, 524 U.S. at 403 (attorney-client); *Blau v. United States*, 340 U.S. 332, 333 (1951) (spousal); *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 72 (1st Cir. 1999) (allowing grand jury testimony not because no psychotherapist privilege exists in that context, but rather because a "crime-fraud exception" applies to the privilege).

As to the scope of the privilege, however, I agree with the special counsel that protection for source identities cannot be absolute. Leaks similar to the crime suspected here (exposure of a covert agent) apparently caused the deaths of several CIA operatives in the late 1970s and early 1980s, including the agency's Athens station chief. *See Haig v. Agee*, 453 U.S. 280, 284-85 & n.7 (1981). Other leaks—the design for a top secret nuclear weapon, for example, or plans for an imminent military strike—could be even more damaging, causing harm far in excess of their news value. In such cases, the reporter privilege must give way. Just as attorney-client communications "made for the purpose of getting advice for the commission of a fraud or crime" serve no public interest and receive no privilege, *see United States v. Zolin*, 491 U.S. 554, 563 (1989) (internal quotation marks omitted), neither should courts protect sources whose leaks harm national security while providing minimal benefit to public debate.

Of course, in some cases a leak's value may far exceed its harm, thus calling into question the law enforcement rationale for disrupting reporter-source relationships. For example, assuming Miller's prize-winning Osama bin Laden series caused no significant harm, I find it difficult to see how one could justify compelling her to disclose her sources, given the obvious benefit of alerting the public to then-underappreciated threats from al Qaeda. News reports about a recent budget controversy regarding a super-secret satellite program inspire another example (though I know nothing about the dispute's details and

express no view as to its merits). *See, e.g.*, Dan Eggen & Walter Pincus, *Justice Reviews Request for Probe of Satellite Reports*, Wash. Post, Dec. 16, 2004, at A3; Douglas Jehl, *New Spy Plan Said to Involve Satellite System*, N.Y. Times, Dec. 12, 2004, at A1. Despite the necessary secrecy of intelligence-gathering methods, it seems hard to imagine how the harm in leaking generic descriptions of such a program could outweigh the benefit of informing the public about billions of dollars wasted on technology considered duplicative and unnecessary by leading Senators from both parties. In contrast to the nuclear weapon and military strike examples mentioned above, cases like these appear to involve a balance of harm and news value that strongly favors protecting newsgathering methods.

Given these contrasting examples, much as our civil cases balance "the public interest in protecting the reporter's sources against the private interest in compelling disclosure," *Zerilli*, 656 F.2d at 712; *see also Carey*, 492 F.2d at 634-36, so must the reporter privilege account for the varying interests at stake in different source relationships. In other words, to quote the Justice Department subpoena guidelines, "the approach in every case must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice." 28 C.F.R. § 50.10(a).

Citing our reporter privilege cases—*Zerilli*, *Carey*, and *Ahn*—the special counsel urges us to rely on two factors deemed "central" in those decisions and emphasized in the Justice Department guidelines: first, the requesting party's need for the evidence, and second, that party's exhaustion of alternative sources. *See Zerilli*, 656 F.2d at 712-14; *Ahn*, 231 F.3d at 37; *Carey*, 492 F.2d at 636-37, 638; 28 C.F.R. § 50.10(b), (f)(1). While both these considerations are obviously essential to minimizing the burden on newsgathering, they can serve as exclusive measures in the privilege analysis only where there

exist means of proof other than compelling the reporter's testimony. When prosecuting crimes other than leaks (murder or embezzlement, say) the government, at least theoretically, can learn what reporters know by replicating their investigative efforts, e.g., speaking to the same witnesses and examining the same documents. Accordingly, if a truly exhaustive investigation has failed to prove a crime that the government reasonably believes has occurred, compelled disclosure of a reporter's source may be justified notwithstanding the attendant burdens on newsgathering. As the special counsel acknowledged at oral argument, however, when the government seeks to punish a leak, a test focused on need and exhaustion will almost always be satisfied, leaving the reporter's source unprotected regardless of the information's importance to the public. The reason for this is obvious: Insofar as the confidential exchange of information leaves neither paper trail nor smoking gun, the great majority of leaks will likely be unprovable without evidence from either leaker or leakee. Of course, in some cases, circumstantial evidence such as telephone records may point towards the source, but for the party with the burden of proof, particularly the government in a criminal case, such evidence will often be inadequate.

In leak cases, then, courts applying the privilege must consider not only the government's need for the information and exhaustion of alternative sources, but also the two competing public interests lying at the heart of the balancing test. Specifically, the court must weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value. That framework allows authorities seeking to punish a leak to access key evidence when the leaked information does more harm than good, such as in the nuclear weapon and military strike examples, while preventing discovery when no public interest supports it, as would appear to be the case with Miller's Osama bin Laden articles. Though

flexible, these standards (contrary to the special counsel's claim) are hardly unmanageable. Indeed, the Supreme Court employs a similar requirement of "legitimate news interest," meaning "value and concern to the public at the time of publication," in assessing restrictions on government employee speech. *See City of San Diego v. Roe*, __ U.S. __, 125 S.Ct. 521, 526 (2004) (per curiam). Nor is this analysis "novel," *see* sep. op. at 3 (Henderson, J., concurring), considering its basis in *Zerilli* and *Carey* and the Justice Department's own guidelines.

Though recognizing that leaks with "national security implications" raise different concerns from "information in the nature of 'whistleblowing,'" Appellee's Br. at 44, 48, the special counsel insists that the prosecutor, not the court, should assess factors other than need and exhaustion. Under this theory, balancing the two remaining concerns, the harmfulness of the leaked information and the damage to newsgathering that might flow from enforcing the disputed subpoenas, would be a matter of prosecutorial discretion. In my view, the special counsel's position distorts the roles of judge and prosecutor in evidentiary disputes.

Although courts certainly defer to executive judgments about which crimes merit prosecution—a judgment that is, after all, a "core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465 (1996)—nonetheless the executive branch possesses no special expertise that would justify judicial deference to prosecutors' judgments about the relative magnitude of First Amendment interests. Assessing those interests traditionally falls within the competence of courts. *Cf. Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."). Indeed, while the criminality of a leak and the government's decision to press charges might well indicate the leak's harmfulness—a central concern of the balancing

test—once prosecutors commit to pursuing a case they naturally seek all useful evidence. Consistent with that adversarial role, the Federal Rules of Evidence assign to courts the function of neutral arbiter: "Preliminary questions concerning the qualification of a person to be a witness, *the existence of a privilege*, or the admissibility of evidence shall be determined by the court." Fed. R. Evid. 104(a) (emphasis added). Accordingly, just as courts determine the admissibility of hearsay or the balance between probative value and unfair prejudice under Rule 403, so with respect to this issue must courts weigh factors bearing on the privilege.

Moreover, in addition to these principles applicable to the judicial role in any evidentiary dispute, the dynamics of leak inquiries afford a particularly compelling reason for judicial scrutiny of prosecutorial judgments regarding a leak's harm and news value. Because leak cases typically require the government to investigate itself, if leaks reveal mistakes that high-level officials would have preferred to keep secret, the administration may pursue the source with excessive zeal, regardless of the leaked information's public value. Of course, in this case a special counsel was appointed to exercise independent judgment. Yet independent prosecutors, too, may skew their assessments of the public interests implicated when a reporter is subpoenaed. After all, special prosecutors, immune to political control and lacking a docket of other cases, face pressure to justify their appointments by bagging their prey. *Cf. Morrison v. Olson*, 487 U.S. 654, 727-28 (1988) (Scalia, J., dissenting) (noting "the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation" and observing that "the primary check against prosecutorial abuse is a political one"). To be clear: I do not impugn the motives of this special counsel. Indeed, as I conclude below, his pursuit of the reporters' testimony appears reasonable. Nevertheless, these considerations—the special counsel's political independence, his

lack of a docket, and the concomitant risk of overzealousness—weigh against his claim to deference in balancing harm against news value.

Paralleling the special counsel's argument about executive discretion, my concurring colleague suggests that my approach pays insufficient deference to Congress. *See* sep. op. at 8 (Henderson, J., concurring). "*Branzburg*," she writes, "warns of the risk inherent in the judicial assessment of the importance of prosecuting particular crimes." *See id.* Although it is true that *Branzburg* cautioned against second-guessing the "legislative judgment . . . of what conduct is liable to criminal prosecution," 408 U.S. at 706, it did so in a passage rejecting a test of governmental need that apparently "distinguish[ed] between the value of enforcing different criminal laws," deeming some statutes "compelling" and others unimportant. *See id.* at 702, 705-06. The approach I propose entails no such judgment about the value of the statute under which the government is proceeding. Rather, my approach focuses on whether evidence the government believes it needs, i.e., a reporter's testimony about a particular source, is privileged. To be sure, insofar as the reporter's testimony is critical in a particular case, privileging the evidence may render that case unprovable. But that risk accompanies any privilege or indeed any rule of evidentiary exclusion. Had Congress believed that judicial decisions excluding evidence interfered with its "legislative judgment" regarding underlying crimes, it would hardly have authorized recognition of common law privileges by enacting Rule 501.

Furthermore, and perhaps even more important, *Branzburg* addressed only a First Amendment privilege claim. *See supra* at 14. In that case, therefore, because Congress cannot overturn constitutionally based decisions, recognizing the asserted privilege would have permanently foreclosed punishment of any crimes dependent on proof subject to the privilege. The

qualified privilege I would recognize, however, rests on Rule 501, not the Constitution. If Congress believes that this approach overrides its judgment about what conduct should be criminal, it may simply overturn the privilege and authorize use of the evidence.

Next, the special counsel argues that waivers signed by suspected sources represent an "additional factor" favoring compulsion of the reporters' testimony. Appellee's Br. at 46. As the reporters point out, however, numerous cases (including persuasive district court decisions from this circuit) indicate that only reporters, not sources, may waive the privilege. *See, e.g.*, *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980); *Palandjian v. Pahlavi*, 103 F.R.D. 410, 413 (D.D.C. 1984); *Anderson v. Nixon*, 444 F. Supp. 1195, 1198-99 (D.D.C. 1978). For the contrary proposition, the special counsel cites *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003), but that case involved a criminal defendant's effort to obtain non-confidential records from the biographers of a government witness, not waiver of confidentiality by a previously unidentified source. *See id.* at 531, 533-34. Nor does *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002), help the special counsel. While that decision indicated that "'the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure,'" *id.* at 120 (quoting *Shoen v. Shoen*, 5 F.3d 1289, 1295 (9th Cir. 1993)), it quashed the subpoena at issue, reasoning that "the privilege for journalists shields both confidential and nonconfidential information from compelled disclosure," *id*.

As this case law recognizes, a source's waiver is irrelevant to the reasons for the privilege. Because the government could demand waivers—perhaps even before any leak occurs—as a condition of employment, a privilege subject to waiver may, again, amount to no privilege at all, even in those leak cases

where protecting the confidential source is most compelling. Moreover, although the attorney-client and psychotherapist privileges are waivable by clients and patients, respectively, *see, e.g.*, *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) (attorney-client); *Jaffee*, 518 U.S. at 15 n.14 (psychotherapist), that is because those privileges exist to prevent disclosure of sensitive matters related to legal and psychological counseling, *see, e.g.*, *Swidler & Berlin*, 524 U.S. at 407-08; *Jaffee*, 518 U.S. at 10-11, a rationale that vanishes when the source authorizes disclosure. In contrast, the reporter privilege safeguards public dissemination of information—the *reporter's* enterprise, not the source's.

Consistent with that purpose, the privilege belongs to the reporter. Not only are journalists best able to judge the imperatives of newsgathering, but while the source's interest is limited to the particular case, the reporter's interest aligns with the public, for journalists must cultivate relationships with other sources who might keep mum if waiving confidentiality at the government's behest could lead to their exposure. Indeed, as compared to counseling-related privileges, the privilege against spousal testimony represents a better analogy. Just as under *Trammel*'s waiver theory testifying spouses, regardless of the other spouse's wishes, may judge for themselves whether their testimony will undermine "marital harmony," *see Trammel*, 445 U.S. at 44-45, 52-53, so should journalists—the experts in newsgathering—base the decision to testify on their own assessment of the consequences, unconstrained by their source's waiver (provided other requirements of the privilege are met).

For their part, appellants insist that a qualified privilege fails to provide the certainty their work requires because sources are unlikely to disclose information without an advance guarantee of secrecy. In particular, they argue that journalists cannot balance a leak's harm against its news value until they know what information the source will reveal, by which time it

is too late to prevent disclosure. True enough, but journalists are not the ones who must perform the balancing; sources are. Indeed, the point of the qualified privilege is to create disincentives for the source—disincentives that not only promote the public interest, but may also protect journalists from exploitation by government officials seeking publication of damaging secrets for partisan advantage. Like other recipients of potentially privileged communications—say, attorneys or psychotherapists—the reporter can at most alert the source to the limits of confidentiality, leaving the judgment of what to say to the source. While the resulting deterrent effect may cost the press some leads, little harm will result, for if the disincentives work as they should, the information sources refrain from revealing will lack significant news value in the first place.

In any event, although *Jaffee* said that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation . . . [will] eviscerate the effectiveness of the privilege," 518 U.S. at 17, the clash of fundamental interests at stake when the government seeks discovery of a reporter's sources precludes a categorical approach. *See Zerilli*, 656 F.2d at 712 n.46 (rejecting arguments for greater "specificity" as to the scope of the First Amendment privilege in civil litigation). And as we explained in *Zerilli*, the "deterrence effect" on beneficial newsgathering will be small if courts make clear that the privilege is "overridden only in rare circumstances." *See id.* at 712 & n.46.

In short, the question in this case is whether Miller's and Cooper's sources released information more harmful than newsworthy. If so, then the public interest in punishing the wrongdoers—and deterring future leaks—outweighs any burden on newsgathering, and no privilege covers the communication (provided, of course, that the special counsel demonstrates necessity and exhaustion of alternative evidentiary sources).

**III.**

Applying this standard to the facts of this case, and considering first only the public record, I have no doubt that the leak at issue was a serious matter. Authorized "to investigate and prosecute violations of any federal criminal laws related to the underlying alleged unauthorized disclosure, as well as federal crimes committed in the course of, and with intent to interfere with, [his] investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses," *see* Letter from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, United States Attorney, Northern District of Illinois (Feb. 6, 2004), the special counsel is attempting to discover the origins of press reports describing Valerie Plame as a CIA operative monitoring weapons of mass destruction. *See* majority op. at 3-5. These reports appeared after Plame's husband, former Ambassador Joseph Wilson, wrote in a *New York Times* op-ed column that his findings on an official mission to Niger in 2002 cast doubt on President Bush's assertion in his January 2003 State of the Union address that Iraq "recently sought significant quantities of uranium from Africa." *See id.* at 3.

An alleged covert agent, Plame evidently traveled overseas on clandestine missions beginning nearly two decades ago. *See, e.g.*, Richard Leiby & Dana Priest, *The Spy Next Door; Valerie Wilson, Ideal Mom, Was Also the Ideal Cover*, Wash. Post, Oct. 8, 2003, at A1. Her exposure, therefore, not only may have jeopardized any covert activities of her own, but also may have endangered friends and associates from whom she might have gathered information in the past. Acting to criminalize such exposure of secret agents, *see* 50 U.S.C. § 421, Congress has identified that behavior's "intolerable" consequences: "[t]he loss of vital human intelligence which our policymakers need, the great cost to the American taxpayer of replacing intelligence resources lost due to such disclosures, and the greatly increased

risk of harm which continuing disclosures force intelligence officers and sources to endure." S. Rep. No. 97-201, at 10-11 (1981), *reprinted in* 1982 U.S.C.C.A.N. 145, 154-55.

The leak of Plame's apparent employment, moreover, had marginal news value. To be sure, insofar as Plame's CIA relationship may have helped explain her husband's selection for the Niger trip, that information could bear on her husband's credibility and thus contribute to public debate over the president's "sixteen words." Compared to the damage of undermining covert intelligence-gathering, however, this slight news value cannot, in my view, justify privileging the leaker's identity.

Turning now to the classified material, I agree with the special counsel that ex parte review presents no due process difficulty. To be sure, grand jury secrecy is not absolute. As Rule 6(e) itself provides, courts may "authorize disclosure . . . of a grand jury matter . . . preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E). In addition, as the reporters point out, even apart from *United States v. Dinsio*, 468 F.2d 1392 (9th Cir. 1973), now superceded by *United States v. Mara*, 410 U.S. 19 (1973), *see* majority op. at 19 (citing *In re Braughton*, 520 F.2d 765, 767 (9th Cir. 1975)), the Second and Ninth Circuits have held that due process requires an "uninhibited adversary hearing" in civil contempt proceedings, *see United States v. Alter*, 482 F.2d 1016, 1024 (9th Cir. 1973) (internal quotation marks omitted); *In the Matter of Kitchen*, 706 F.2d 1266, 1272 (2d Cir. 1983) (internal quotation marks omitted), including "the right to confront all the government's evidence, both documentary and testimonial, unless particular and compelling reasons peculiar to the grand jury function require some curtailment of [that] right," *Kitchen*, 706 F.2d at 1272.

In this circuit, however, we have approved the use of "*in camera*, *ex parte* proceedings to determine the propriety of a

grand jury subpoena or the existence of a crime-fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998) (per curiam). Just as due process poses no barrier to forcing an attorney to testify based on the court's examination of evidence, unseen by the lawyer, that the client sought legal advice in pursuit of a crime, neither does it preclude compulsion of a reporter's testimony based on a comparable review of evidence, likewise unseen by the reporter, that a source engaged in a harmful leak. In fact, appellants' protests notwithstanding, ex parte review protects their interests, as it allows the government to present—and the court to demand—a far more extensive showing than would otherwise be possible given the need for grand jury secrecy discussed in the court's opinion, *see* majority op. at 17-18.

That said, without benefit of the adversarial process, we must take care to ensure that the special counsel has met his burden of demonstrating that the information is both critical and unobtainable from any other source. Having carefully scrutinized his voluminous classified filings, I believe that he has.

With respect to Miller, the special counsel seeks evidence regarding two exchanges with I. Lewis "Scooter" Libby, Vice President Cheney's Chief of Staff and National Security Adviser: first, an in-person meeting in Washington, D.C. on July 8, 2003, and second, a telephone conversation on July 12, 2003. Before the grand jury, Libby testified that although he had previously learned about Wilson's wife's employment, he had forgotten it by July 8 and recalled no discussion of Wilson during his meeting with Miller. (I-105, 134-35, 279.) As to the July 12 conversation, Libby stated, "I said to her that, that I didn't know if it was true, but that reporters had told us that the ambassador's wife works at the CIA, that I didn't know

anything about it." (I-208.) Because other testimony and evidence raises doubts about Libby's claims, the special counsel believes Miller's testimony is "essential to determining whether Libby is guilty of crimes, including perjury, false statements and the improper disclosure of national defense information." (8/27/04 Aff. at 28; see also id. at 1-2.)

The special counsel's argument is persuasive. As Libby admits, in mid-June 2003, when reports first appeared about the Niger trip, the vice president informed Libby "in an off sort of curiosity sort of fashion" that the Niger envoy's wife worked at the CIA's counterproliferation division. (I-50-55, 245-46.) In addition, handwritten notes by Libby's CIA briefer indicate that Libby referred to "Joe Wilson" and "Valerie Wilson" in a conversation on June 14. (8/27/04 Aff. at 12.) Nevertheless, Libby maintains that he believed he was learning about Wilson's wife's identity for the first time when he spoke with NBC Washington Bureau Chief Tim Russert on July 10 or 11 regarding coverage of the Niger issue by MSNBC correspondent Chris Matthews. (I-162-69; 8/27/04 Aff. at 9-10.) According to Libby, Russert told him, "[D]id you know that Ambassador Wilson's wife works at the CIA? . . . [A]ll the reporters know it." (I-166.) Claiming to have been "a little taken aback by that," Libby testified, "I said, no, I don't know that intentionally because I didn't want him to take anything I was saying as in any way confirming what he said, because at that point in time I did not recall that I had ever known, and I thought this is something that he was telling me that I was first learning." (I-166.)

Russert recalls this conversation very differently. In his deposition, describing Plame's employment as a fact that would have been "[v]ery" significant to him—one he would have discussed with NBC management and potentially sought to broadcast—Russert stated, "I have no recollection of knowing that [Wilson's wife worked at the CIA], so it was impossible for

me to have [told Libby] that." (I-43, 32.) Asked to describe his "reaction" to Novak's July 14 column, Russert said, "Wow. When I read that—it was the first time I knew who Joe Wilson's wife was and that she was a CIA operative. . . . [I]t was news to me." (I-433.)

Also contrary to Libby's testimony, it appears that Libby discussed Plame's employment on several occasions before July 10. (*See* 8/27/04 Aff. at 11-12.)  For example, then-White House Press Secretary Ari Fleischer recalls that over lunch on July 7, the day before Libby's meeting with Miller, Libby told him, "[T]he Vice-President did not send Ambassador Wilson to Niger . . . the CIA sent Ambassador Wilson to Niger. . . . [H]e was sent by his wife. . . . [S]he works in . . . the Counterproliferation area of the CIA." (II-545-47.) Describing the lunch as "kind of weird" (II-590-91), and noting that Libby typically "operated in a very closed-lip fashion" (II-592), Fleischer recalled that Libby "added something along the lines of, you know, this is hush-hush, nobody knows about this.  This is on the q.t." (II-546-47.)  Though Libby remembers the lunch meeting, and even says he thanked Fleischer for making a statement about the Niger issue, he denies discussing Wilson's wife.  (I-108-09, 156, 226-27.)

As to the July 12 conversation, *Libby testified that while flying back from an event in Norfolk on Air Force Two, Vice President Cheney dictated several statements relating to the sixteen words controversy, some to be given to reporters on-the-record, others on background and deep background.  (I-193-201.) After landing,* Libby called several journalists, including Cooper and Miller. (I-202-03.) As Libby tells it, Cooper, whom he reached first, asked him why Wilson claimed Cheney had ordered the trip, to which Libby responded, "[Y]ou know, off-the-record, reporters are telling us that Ambassador Wilson's wife works at the CIA and I don't know if it's true. . . . [W]e don't know Mr. Wilson, we didn't know anything about his

mission, so I don't know if it's true. But if it's true, it may explain how he knows some people at the Agency and maybe he got some bad skinny, you know, some bad information." (I-203-06.) According to Libby, Miller, too, said something that "triggered" him to mention that "reporters had told us that the ambassador's wife works at the CIA." (I-207-09.)

In contrast, in a deposition limited to Cooper's contacts with Libby (*see* II-32-33, 107), Cooper said that he (Cooper) asked Libby "something along the lines of what do you know about Wilson's wife being involved in, you know, sending him on this mission?" (II-53.) According to Cooper, Libby responded, "[Y]eah, I've heard that too" (II-54), which Cooper took as confirmation (II-81-91). *Also, though Libby now claims not to remember Cheney telling him to discuss Plame's employment, he told the FBI during a preliminary interview that it was "possible" that he received such instructions. (I-201, 391.) Perhaps indicating the issue was on Cheney's mind, the vice president's copy of Wilson's op-ed, which Cheney cut out and kept on his desk, carries the following handwritten note: "[H]ad they done this sort of thing before[,] send an ambassador to answer a question? [D]o we ordinarily send people out pro bono to work for us? [O]r did his wife send him on a junket?" (I-308-12.)*

Given the evidence contradicting Libby's testimony, the special counsel appears already to have at least circumstantial grounds for a perjury charge, if nothing else. Miller's testimony, however, could settle the matter. If Libby mentioned Plame during the July 8 meeting—and Miller's responses to the documentary subpoena suggest she has notes from that conversation (*see* 8/27/04 Aff. at 19-20)—then Libby's version of events would be demonstrably false, since the conversation occurred before he spoke to Russert. Even if he first mentioned Plame on July 12, as he claims, inconsistencies between his recollection and Miller's could reinforce suspicions of perjury.

What's more, if Libby mentioned Plame's covert status in either conversation, charges under the Intelligence Identities Protection Act, 50 U.S.C. § 421, currently off the table for lack of evidence (*see* 8/27/04 Aff. at 28 & n.15), might become viable. Thus, because Miller may provide key corroboration or contradiction of Libby's claims—evidence obviously available from no other source—the special counsel has made a compelling showing that the subpoenas directed at Miller are vital to an accurate assessment of Libby's conduct.

Regarding Cooper, *the special counsel has demonstrated that his testimony is essential to charging decisions regarding White House adviser Karl Rove. (See 9/27/04 Aff. at 22-23). Although uncontradicted testimony indicates that Novak first learned Wilson's wife's place of employment during a meeting on July 8 with Deputy Secretary of State Richard Armitage (see 8/27/04 Aff. at 18), Novak said in grand jury testimony that he confirmed Plame's employment with Rove (II-153-54), a longstanding source for his columns (II-121-22). According to Novak, when he "brought up" Wilson's wife, "Mr. Rove said, oh, you know about that too" (II-154) and promised to seek declassification of portions of a CIA report regarding the Niger trip, which Rove said "wasn't an impressive piece of work or a very definitive piece of work" (II-158). In an October 2003 column describing his sources, Novak identified Armitage's comment as an "offhand revelation" from "a senior administration official" who was "no partisan gunslinger." (II-20.) He referred to Rove simply as "another official" who said, "Oh, you know about it." (II-20, 209-11.)*

*Upon reading Novak's October column, Armitage recognized himself as Novak's source and, as he told the grand jury, "went ballistic." (II-859-60.) He contacted Secretary of State Colin Powell to offer his resignation (II-862-64) and spoke the next day with FBI and Justice Department officials investigating the leak (II-878-79). "I was very unhappy at*

*myself," Armitage testified, "because I had let the President down, I'd let the Secretary down, and frankly, I'd let Ambassador and Mrs. Wilson down. In my view inadvertently, but that's for others to judge." (II-860.)*

* * * * *[REDACTED] * * * *

In any event, as with the Miller subpoenas, the evidence sought from Cooper appears essential to accurate understanding of events and could obviously provide information unavailable elsewhere. Thus, again, the special counsel has shown that this evidence is crucial to accurate decision-making by the grand jury.

As to the leaks' harmfulness, although the record omits specifics about Plame's work, it appears to confirm, as alleged in the public record and reported in the press, that she worked for the CIA in some unusual capacity relating to counterproliferation. Addressing deficiencies of proof regarding the Intelligence Identities Protection Act, the special counsel refers to Plame as "a person whose identity the CIA was making specific efforts to conceal and who had carried out covert work overseas within the last 5 years"—representations I trust the special counsel would not make without support. (8/27/04 Aff. at 28 n.15.) In addition, Libby said that Plame worked in the CIA's counterproliferation division (I-53-55, 245-46), *and Armitage's testimony identifies a document referring to Plame as a "WMD managerial-type," wording Armitage considered "strange," though he "assumed she was another analyst" (II-783-84, 809, 815-16).* Most telling of all, Harlow, the CIA spokesperson, though confirming Plame's employment, asked Novak to withhold her name, stating that "although it is very unlikely that she will ever be on another overseas mission . . . it might be embarrassing if she goes on foreign travel on her own" (II-168-69), a statement that strongly implies Plame was covert at least at some point. While another case might require more specific evidence that a leak harmed national security, this showing suffices here, given the information's extremely slight news value and the lack of any serious dispute regarding Plame's employment.

Finally, while it is true that on the current record the special counsel's strongest charges are for perjury and false statements rather than security-related crimes, that fact does not alter the privilege analysis. Insofar as false testimony may have impaired the special counsel's identification of culprits, perjury in this context is itself a crime with national security implications. What's more, because the charges contemplated here relate to false denials of responsibility for Plame's exposure, prosecuting perjury or false statements would be tantamount to punishing the

leak. Thus, given the compelling showing of need and exhaustion, plus the sharply tilted balance between harm and news value, the special counsel may overcome the reporters' qualified privilege, even if his only purpose—at least at this stage of his investigation—is to shore up perjury charges against leading suspects such as Libby *and Rove.*

In sum, based on an exhaustive investigation, the special counsel has established the need for Miller's and Cooper's testimony. Thus, considering the gravity of the suspected crime and the low value of the leaked information, no privilege bars the subpoenas.

One last point. In concluding that no privilege applies in this case, I have assigned no importance to the fact that neither Cooper nor Miller, perhaps recognizing the irresponsible (and quite possibly illegal) nature of the leaks at issue, revealed Plame's employment, though Cooper wrote about it after Novak's column appeared. Contrary to the reporters' view, this apparent self-restraint spares Miller and Cooper no obligation to testify. Narrowly drawn limitations on the public's right to evidence, testimonial privileges apply "only where necessary to achieve [their] purpose," *Fisher v. United States*, 425 U.S. 391, 403 (1976), and in this case the privilege's purpose is to promote dissemination of useful information. It thus makes no difference how these reporters responded to the information they received, any more than it matters whether an attorney drops a client who seeks criminal advice (communication subject to the crime-fraud exception) or a psychotherapist seeks to dissuade homicidal plans revealed during counseling (information *Jaffee* suggested would not be privileged, *see* 518 U.S. at 18 n.19). In all such cases, because the communication is unworthy of protection, recipients' reactions are irrelevant to whether their testimony may be compelled in an investigation of the source.

Indeed, Cooper's own *Time*.com article illustrates this point. True, his story revealed a suspicious confluence of leaks,

contributing to the outcry that led to this investigation. Yet the article had that effect precisely because the leaked information—Plame's covert status—lacked significant news value. In essence, seeking protection for sources whose nefariousness he himself exposed, Cooper asks us to protect criminal leaks so that he can write about the crime. The greater public interest lies in preventing the leak to begin with. Had Cooper based his report on leaks *about* the leaks—say, from a whistleblower who revealed the plot against Wilson—the situation would be different. Because in that case the source would not have revealed the name of a covert agent, but instead revealed the fact that others had done so, the balance of news value and harm would shift in favor of protecting the whistleblower. Yet it appears Cooper relied on the Plame leaks themselves, drawing the inference of sinister motive on his own. Accordingly, his story itself makes the case for punishing the leakers. While requiring Cooper to testify may discourage future leaks, discouraging leaks of this kind is precisely what the public interest requires.

## IV.

I conclude, as I began, with the tensions at work in this case. Here, two reporters and a news magazine, informants to the public, seek to keep a grand jury uninformed. Representing two equally fundamental principles—rule of law and free speech—the special counsel and the reporters both aim to facilitate fully informed and accurate decision-making by those they serve: the grand jury and the electorate. To this court falls the task of balancing the two sides' concerns.

As James Madison explained, "[A] people who mean to be their own Governors must arm themselves with the power which knowledge gives." *See In re Lindsey*, 148 F.3d 1100, 1109 (D.C. Cir. 1998) (quoting Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 The Writings of James Madison 103

(Gaillard Hunt ed., 1910)).  Consistent with that maxim, "[a] free press is indispensable to the workings of our democratic society," *Associated Press v. United States*, 326 U.S. 1, 28 (1945) (Frankfurter, J., concurring), and because confidential sources are essential to the workings of the press—a practical reality that virtually all states and the federal government now acknowledge—I believe that "reason and experience" compel recognition of a privilege for reporters' sources.  That said, because "[l]iberty can only be exercised in a system of law which safeguards order," *Cox v. Louisiana*, 379 U.S. 559, 574 (1965), the privilege must give way to imperatives of law enforcement in exceptional cases.

Were the leak at issue in this case less harmful to national security or more vital to public debate, or had the special counsel failed to demonstrate the grand jury's need for the reporters' evidence, I might have supported the motion to quash. Because identifying appellants' sources instead appears essential to remedying a serious breach of public trust, I join in affirming the district court's orders compelling their testimony.